[No. G027307. Fourth Dist., Div. Three. Feb. 15, 2002.]

VICTORIA CHEN, Plaintiff and Appellant, v.
COUNTY OF ORANGE et al., Defendants and Respondents.

**COUNSEL**

Oswald & Yap, Law Offices of Robert B. Reeves and Niall Sweetnam for Plaintiff and Appellant.

Lewis, D'Amato, Brisbois & Bisgaard, Nancy E. Zeltzer and Gary M. Lape for Defendants and Respondents.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

Victoria Chen was hired by the Orange County District Attorney's Office as a level I deputy district attorney in 1990, and by 1993 had been promoted to level III. In July 1995 she went on leave because of complications with a pregnancy, but did not return to work until April 1997.

During her time on leave she earned, as she would later admit in court, in the "neighborhood" of $100,000 a year as a bond trader. She also tried a career in acting. She appeared "in an unpaid infomercial" and two commercials.

Then, after a short, and by all accounts unhappy, stint working in Orange County's North Court, she went on medical leave for stress in July 1997, and

never came back to work. In the fall of that year, while still on stress leave, she decided to apply, along with about 40 or so other deputy district attorneys in the office, for some 10 openings for level IV.

She contacted Vickie Hix, who was a management-level deputy district attorney (level V rank) and asked Hix if she would nominate her for promotion to level IV at the upcoming promotional meeting. Hix was rather reluctant to take up the task, since Chen had never worked for Hix and Hix had no personal knowledge of her background. Hix then mentioned that there was one question all of the people at the meeting would be interested in having answered: When would Chen come back to work, because "people we promote we need to have on the job."

Chen said that if she got the promotion, she'd be back. But "if not," she would "probably be stressed out for a while longer."

Chen did not get the promotion, and continued to be ostensibly "stressed out" for a great deal longer. Actually, indefinitely. She never returned to work. She filed this suit in March 1998, alleging marital status, race, and gender discrimination against her by the Orange County District Attorney's Office. She also asserted a cause of action for retaliation. (She had filed a complaint with the Department of Fair Employment and Housing in October 1997—before her 1997 promotion request was turned down).

In November 1998, still not having returned back to work, she applied again for promotion to level IV. Again, she did not receive a promotion, and her lawsuit was subsequently amended to allege that the promotion denial was also taken in retaliation for her complaints.

Her marital status claim was based on allegations that she had received unfavorable assignments during her career because, beginning in late 1990, she began dating, and in May 1993 married, Devallis Rutledge, a high-level management attorney in the office. Rutledge was supposedly not in the good graces of then Orange County District Attorney Michael Capizzi, and Chen's unfavorable assignments were allegedly a manifestation of the Capizzi faction's lack of approval of her relationship with, and marriage to, Rutledge.

The race and gender discrimination causes of action went to a jury, who returned defense verdicts. The marital status and retaliation claims were dismissed on motions for nonsuit after Chen rested her case. Chen has now appealed the verdicts. In sum, here is what we conclude:

(1) The trial court did not err in dismissing the marital status discrimination claim. The salient fact is that the origin of any animus was the *political*

disfavor Rutledge was in at the time, not any antipathy toward Chen's *status* as a married or single person. There was not even any antipathy toward her being married to (or even romantically involved with) a coworker. Any "adverse action" taken by her employer (which mostly consisted of not getting plum assignments) was at most only the result of antipathy toward a *particular* coworker with whom she had, married or not, a relationship.

(2) The trial court did not err in dismissing the retaliation claim. As we explain, it is well established that a plaintiff in a retaliation suit must show, as part of his or her prima facie case, some causal connection between an adverse employment action and the original complaint of discrimination. Mere sequence is not enough—that would be the classic logical fallacy of "post hoc ergo propter hoc" (after the fact, therefore because of the fact). In this case, Chen showed nothing but sequence in a context where there were obviously good and legitimate reasons not to promote her, not the least of which was the fact that anybody who was promoted had to be available for work, not on indefinite stress leave.

(3) None of Chen's miscellaneous claims of evidentiary error have any merit.

## II. THE FACTS: THE HISTORY OF CHEN'S CAREER IN THE ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE[1]

### A. *1990-1993: Paying Dues and Eventual Promotion to the Felony Panel*

Victoria Chen started with the district attorney's office in July 1990. Of 75 attorneys hired in the years 1989, 1990, and 1991, only 20 initially received trial assignments. Trial assignments, at least according to Chen's testimony, were generally more coveted by newly hired deputy district attorneys than assignments in juvenile delinquency or family support, and Chen was one of the 20 or so who received one. Within five months of her

---

[1]Chen's "summary of material facts" in her opening brief is *not* written in chronological order, but in terms of broad categories of miscellaneous facts (e.g., "Consistently Meritorious Performance," "Extensive Pattern of Adverse Employment Actions," and "Marital Status Discrimination") without any reference to where they fit in the history of Chen's employment with the Orange County District Attorney's Office. Isolated incidents are presented out of context without regard to when they happened in a nine-year period of her employment covered by this case. The evident hope is that the accumulation by category will paint a more vivid picture than a simple chronological presentation would. In reality, the technique presents (as it does in the movies) a distorted picture. The net effect is a jumbled gestalt. Thus, particularly in the light of the voluminous record, the opening brief is not very helpful in explaining to the reader what the facts of the case are. Chen therefore should not complain if our narrative follows more closely the chronologically oriented statement of facts in the respondent's brief.

hiring, Chen began dating Devallis Rutledge, a high-level management attorney in Capizzi's administration.

Chen was transferred to juvenile court in April 1991. She thought the transfer might be a form of discrimination, and discussed the matter with her beau Rutledge, but did not complain about the assignment.[2] While at juvenile court she complained that another coworker, Karen Whetmore, was "abusing taxpayer money by using county time to slander me, to say scurrilous things about me," specifically that Chen was "a troublemaker, . . . a backstabber, . . . a gossip."[3] Her supervisor, Kathi Harper, replied that "she was not going to get involved in a catfight."

In July 1991, one year after her hiring, Chen was promoted to deputy level II. She also didn't have to spend too much time in juvenile court. In September 1991 she was assigned to Central Municipal Court, where she did jury trials and preliminary hearings.

In July 1992, she was promoted again, to level III. That summer she also applied for a felony panel assignment. Thirty-one attorneys applied; Chen was third from the bottom in terms of seniority. She didn't get the assignment, nor did any of the applicants with less seniority. All the applicants who did make it were women.

Disappointed with not having received the felony panel assignment, Chen had a talk with one of the senior management attorneys, Brent Romney. Romney gave her what was known in the office as the "butterfly speech."

---

[2] We weren't born yesterday, so let's just say what many people in the legal community already think: While some judges and lawyers feel they have a real calling to work in the area (it is after all, like teaching, where one's work can have a positive influence on young lives), there is a general perception among the bench and bar that juvenile court, both delinquency and dependency, is "Siberia"—the place where you pay your dues or are sent when you have incurred management's disfavor. Hence both judges and county lawyers (county counsel, deputy district attorneys, public defenders) are typically rotated in and out of a juvenile assignment, and new judges and county lawyers, i.e., those lowest on the seniority totem pole, have to "do time" there before they can progress to what are perceived to be more exalted assignments. We certainly do not share the view that dependency work is inferior; on the contrary, the work done in the dependency court may well be the most important work lawyers and judges perform. But, whether Chen and others share this view or not, courtrooms must be staffed and covered with judges and lawyers, and if the junior judges and lawyers are often sent to juvenile court for some seasoning experience, so be it. Even though the relative undesirability of juvenile court work is a subtext of Chen's claim (there are good assignments and there are bad assignments, and she was getting a bad assignment), Chen has never articulated why she, as a beginning deputy district attorney, thought herself so wonderful that she should be exempted from a normal juvenile court rotation.

[3] Whetmore is Asian. The fact will have significance later on in this opinion, because, ironically, even though Chen and Whetmore did not get along, Chen would try to admit evidence of Whetmore's own career in her sex and race discrimination case.

Romney often gave the butterfly speech to new law clerks (both men and women) in the district attorney's office, the substance of which was: "Don't be in such a hurry to get to point 'A' when you come into the office that you lose sight of and lose enjoyment of what you're doing as you go along. And if you just go in and just do your job, things will come to you." The butterfly metaphor derived from the image of a butterfly landing on one's shoulder, presumably in the course of just doing one's job. As Chen would later describe the conversation, "I tried to talk to Brent [about her not being assigned to the felony panel], but all he was talking about was—all he wanted to talk about was some silly butterfly landing on my shoulder." For all the speech's supposed silliness, Chen did not complain, and later (in April 1997), before she sued him (he is one of the named defendants in this case), would encourage him to run for district attorney when Michael Capizzi sought higher office.

In February 1993 Romney also told Chen about unhappiness by some of the other managers with her relationship with Rutledge. Chen's later testimony in that regard was this: "He [Romney] had said that some of the other managers resented my relationship with Devallis Rutledge and that because I chose to date him, that I had put myself—and the term he used was I had put myself behind the eightball." She elaborated: "He said that—um, Judge Rheinheimer was negative. He said that I had put myself behind the eightball by making the decision to date Devallis, and because I had done that, that I was held to a higher standard than the other deputies, and that in order to get promoted, I had to go an extra mile. [¶] I had to go an extra mile to prove myself because—because of my relationship with Devallis, and that peers and management thought that I was dating him just to get ahead in the office."

In March 1993, she was transferred to North Court, which was her second choice after the felony panel assignment. But by August 1993 Chen got her wish and was promoted to the felony panel. Only five of 28 applicants made it, and Chen had the least amount of seniority of those.

### B. *1993-1995: Disappointed by Her Assignments (Mostly)*

Being least senior, Chen was assigned to department 5, which handled the probation violation calendar. About once every two weeks one of her coworkers would get a call from either the supervisor or one of the clerks in the department to cover the calendar because Chen was late; on some of those occasions Chen wouldn't even come in at all. And because probation violation hearings would occur in department 5, as one management attorney would later put it, "it caused problems if the deputy didn't show up."

Judge Brenner, who presided over department 5, complained to Chen's supervisor that Chen was late for court. (As one management attorney would later observe, "The judge in Department 5 wants that court covered, and somebody better be there at 8:30.") Judge Brenner also observed Chen "giggling in court" with another deputy and "drawing pictures" while court was in session. He told her supervisor that Chen "was aggressive" and wouldn't "back off an inch on anything."

The judge also mentioned to Chen's supervisor that Chen "had no sense of the witness," that is, would not be able to tell when the witness was lying. And he mentioned that Chen was "manipulative" and "schmoozing" toward him. Finally, there was "friction between the staff and Miss Chen" in department 5, (though the management attorney who noted it for Chen's evaluation would not be able to recall the nature of the friction).

Chen's next assignment was to Judge Jackman's courtroom. Judge Jackman was perceived by the management of the district attorney's office to be "a problem in light sentencing" and managers "wanted somebody to go there who was a strong advocate for [presumably much harsher] sentencing."[4] The hope was that Chen's vigorous advocacy "could keep his sentencing up." So one of the managers told her, when she complained, that she should consider the assignment "a challenge." On the other hand, the district attorney's management also perceived Judge Jackman as "very much of a gentleman" who was a "very forgiving man" and therefore if Chen came in late on occasion, "it wouldn't be much of a problem as it would cause in some of the other judges' courtrooms."

During her felony panel assignment Chen typically carpooled with her fiancé, later husband, Rutledge. On those days when she drove in alone without Rutledge's elevator key card, however, she faced a small problem. Access to the basement elevator was restricted to managers and deputies who rode bicycles or motorcycles to work. Chen asked that her own card be recoded so she could have access to the elevator, and was turned down. On such days she had to use the stairs.

After Judge Jackman, Chen was assigned to Judge Jack Ryan's courtroom, where there do not appear to have been any problems.

By the spring of 1995 Chen, however, had been assigned to Judge Hicks's courtroom, where she did encounter some difficulties. A three strikes case

---

[4]Michael Jacobs, assistant division head, testified: "I don't mean to criticize Judge Jackman. I'm just saying he was prone, in our opinion, to giving light sentences on heavy cases. So we needed somebody in there . . . who could point out to him reasons why his sentences should be higher, and I thought that Victoria was an aggressive deputy, and I thought she could do that."

came up there that Chen wanted to dismiss after she negotiated a guilty plea for 10 years. Chen was convinced the defendant was factually innocent. One of her supervisors, however, vetoed the idea. She called her other supervisor and said that the supervisor "had bad judgment." But he didn't agree with her either, and concluded that "ten years was a very favorable disposition to the defense." Shortly thereafter the same supervisor would receive a complaint from Judge Hicks to the effect that Chen had told the judge that the two supervisors "don't care about the innocence or guilt of defendants. They just want stats and want us to do trials."

It was also during this general period (1994) that Chen served on a committee organized by Michael Capizzi to deal with any discrimination in the office; Chen referred to it later in trial as the "minority committee." The committee was chaired by "the number two person in administration in the office," Julie Mussche. Chen had occasion to make a report to the committee that there was a disparity between male and female deputies in the average time it would take to be promoted to certain levels. (For example, in the 1994 promotional round, Chen reported to the committee that the average time for men to obtain level IV was 63.4 months, while the average for the women was 73.3 months.)

### C. *1995-1997: A Long Maternity Leave, Bond Trading, and Acting*

Judge Hicks's court was Chen's last assignment before going on maternity leave in June 1995 when she started to go into early labor in the middle of a trial. She stayed out until April 1997—almost two years, apparently in part for "medical reasons" (though this part of the record is not well developed, there is some indication that Chen was suffering from Epstein-Barr syndrome). She would later admit, under cross-examination, however, that during the time period she was on leave she worked as a bond trader and engaged in some acting roles for commercials.

### D. *Spring 1997: A Short Unhappy Stint at North Court*

In April 1997 Chen returned to work for the district attorney's office, and was assigned to the North Court branch. Her supervisor was Kathi Harper, who had specifically asked for Chen. Harper "had a very young team doing felonies at North Court," and Harper thought that having someone with Chen's experience "would have been a tremendous help to that team." Harper welcomed her back and told her she was glad to have her there.

Chen, however, was not happy about her assignment, and let Harper know it. (She wanted an assignment to another court, closer to home, so she could

more easily take care of her child. Then again, most of the returning deputies assigned to North Court also lived in the southern portion of the county as well, and even farther away than Chen.) It probably didn't make all that good an impression on her new supervisor that on the first day she left a training session early at 11:30 a.m. for lunch and did not return until 3:30 p.m.

Things did not improve given the busyness of North Court. Unlike other courts in the county, detectives would bring their files to the deputy district attorneys directly in the morning, and Harper considered it important that deputies doing preliminary hearings be there at 8:00 a.m. when the detectives started arriving. Chen almost never made it in at that time, which became "a problem."

It was a dependability problem that extended to *after* she arrived at work as well. As Harper later testified, "it seemed from the first that all she wanted to do was just kind of get out of there. She had numerous situations involving baby-sitters." In one instance, Chen said, "I have to go home. My mom has an emergency," and Harper said "absolutely," knowing that Chen often used her mother as a babysitter.

But the next day, when Harper asked, "Is your mom okay?" Chen replied, "My mom had an acting job in the San Fernando Valley. My mom is fine. She had an acting job that called her and she had to go take care of it."

Whether Harper had a "no pants" (for women) policy at north court is a matter of dispute in the record. Harper would testify that she had only one conversation with Chen related to the subject, and that was on a day when Chen wore a kind of cocktail party-style jumpsuit with "wild colors." Chen volunteered, "I know it's kind of hideous, isn't it?" to which Harper simply said, "I just hope you're not going to court today," and since Chen wasn't, left it at that. Harper's position on the pants controversy was that she had no hard-and-fast rule; she was merely offering advice. Chen would later testify that she told Michael Capizzi that Harper had an "office policy requiring women to wear skirts if they were in jury trials."

E. *Summer 1997: Stress Leave and Complaints*

Chen wasn't in North Court too long, though. She went on medical leave for stress in mid-July.

Two meetings in the wake of her stress leave are noteworthy. One was a meeting around July 15, in the office of Jan Nolan, director of superior court

operations, in which Brent Romney and Kathi Harper were also brought in. Chen complained about various things: Harper's management style, that Harper had refused to give her the names of deputies who had said "negative things" about her, and that Harper had forbidden her to talk to certain deputies about another deputy who Chen believed wasn't "carrying his weight." Nolan told her she could talk to "anyone she wanted to." She did not assert, however, that she had been the victim of either racial or gender discrimination.

The other meeting was in late July with District Attorney Michael Capizzi himself, that lasted for about an hour. Nolan was also present. During this conversation Chen aired a multitude of grievances from her career: She should have been hired in as a level III deputy instead of a level I deputy because of her past business experience. Her "problems" with Karen Whetmore had been "dismissed as a catfight" (Chen's words).

She further complained of her transfer to juvenile court, and said it was because she showed up at a Christmas party with Devallis Rutledge. She complained that her supervisor in Central Court had given her bad reviews, and had her computer taken away during that period. She complained she had been passed over for the felony panel, and when she finally got there, she only got department 5. She complained she was then sent to Judge Jackman. She complained about being sent to North Court after coming back from maternity leave, including the fact that Karen Whetmore was there too. (Supposedly Karen was "crazy and had sought to destroy her.")

And the list went on. Chen claimed that Kathi Harper had told her "she shouldn't be talking to her husband" and "she is punished for what Devallis does." Harper ran a "reign of terror" at North Court, the "cops and the judges all hate[d] her," and the "secretaries [were] out of control." Harper was jealous because judges and deputies came to Chen instead of her to "resolve the problems."

And on. She complained about the "perception in the office" that she had dated Rutledge to "get ahead." She complained of a no-pants policy instituted by Harper, that Harper had called her a "gossip" (a term never used for men).[5] She complained that Harper called her a troublemaker and a gossip.

The gravamen of her conversation was: either Harper goes or I go. And because Chen also made it clear that any transfer out might be perceived as a "stigma" on her record, that meant that Harper had to go.

---

[5] In the conversation Capizzi would say that that some of the "biggest gossips in the court were men."

Capizzi listened. And at the end he said words to the effect of, "Once an investigation is started, it is very difficult to stop it."[6] He also said that "we would have to investigate thoroughly and we would have to contact the people that she had identified as having some information with respect to it."

Jan Nolan investigated Chen's complaints. Of the 30 deputies hired in the year that Chen was hired, she was one of only six to be given, without prior experience, a trial court assignment. She only had to stay in juvenile court for five months. She lost her computer because no municipal court deputies at the time had computers. The supervisor who gave her a "lousy" evaluation had really marked "superior" for most categories. Chen had never objected to going to North Court or Karen Whetmore's presence. The policy of sending the least senior deputy to department 5 was in place before Chen was sent there. Harper admitted that she had a "preference" (not a "policy") (the same as Michael Capizzi) that pants did not have a "professional look in front of juries," and that because "still women were not being that well accepted in the general community as professionals, particularly in the area of criminal law," which was perceived as a "man's domain," she had advised her deputies that they shouldn't do "anything that might detract from or cause jurors to concentrate on how they looked as opposed to the case they were trying."

### F. *Fall 1997- 2000: Turned Down for Promotion, Litigation Follows*

In October, Chen filed a complaint with the Department of Fair Employment and Housing. The next month, November 1997, while still on stress leave, Chen applied for a promotion from level III to level IV. So did 42 other attorneys, who applied for 10 positions. As we have alluded to in the introduction, Chen had a conversation with Hix prior to the meeting of senior deputies who voted on who to recommend for promotion, in which Chen said that she would return if she got the promotion, but if not, she would continue to be "stressed out for a while longer."

Of the senior deputies who attended the recommendation meeting, Harper did not talk about Chen. Two of the senior deputies voted for Chen; one of them was her husband, Rutledge. The only other time in the district attorney's office when a senior deputy was in a position to vote on something that affected his or her spouse, that particular senior attorney excused himself. Rutledge didn't.

---

[6]Chen's brief claims that Capizzi's response was, "We're going to investigate, alright, but we're going to be investigating *you!*" No record reference was provided for her version of the comment. Our quote *is* taken from the reporter's transcript of Capizzi's testimony concerning the conversation.

Chen didn't get promoted. Chen didn't return to work. She continued to work as a bond trader. She did, however, file this lawsuit in March 1998. Her original complaint listed causes of action for various violations of the Fair Employment and Housing Act (Gov. Code, § 12940 et seq.),[7] "harassment" under section 12940 (harassment because of some listed characteristic, such as race, sex or marital status), defamation (including having been accused of being a gossip, of being divisive, of marrying to get ahead), and retaliation.

Still on leave, Chen applied again in November 1998, and was again turned down for a promotion to level IV. A year later a third amended complaint was filed, narrowing the suit to three causes of action: discrimination in violation of the Fair Employment and Housing Act, retaliation, and constructive termination. The constructive termination claim was dropped in January 2000, as trial loomed. The record is unclear as to what Chen's current status is—for all we know she may still be out on indefinite stress leave.

The trial began January 18, 2000. After Chen rested her case the court granted nonsuit motions as to Chen's claims for marital status discrimination and retaliation; the judge denied the nonsuit motion as to race and gender discrimination and those claims eventually were considered by the jury, who returned a defense verdict. From the ensuing judgment Chen has brought this appeal.

### III. Discussion

#### A. *The Marital Status Claim*

State civil rights statutes have, since the 1970's, typically listed "marital status" as among the categories protected from discrimination. (See § 12940, subd. (a) ["It shall be an unlawful employment practice . . . [¶] (a) For an employer, because of . . . marital status . . . to discriminate against the person in compensation or in terms, conditions, or privileges of employment."].)[8]

Certain kinds of claims, without doubt, implicate marital status discrimination. *Smith v. Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143

---

[7]All statutory references are to the Government Code.

[8]In California the statute specifically allows an employer to "reasonably regulate, for reasons of supervision, safety, security, or morale, the working of spouses in the same department, division or facility, consistent with the rules and regulations adopted by the [Fair Employment and Housing] Commission." (§ 12940, subd. (a)(3)(A).) Administrative rules *allow,* but do not *require,* employers to "refuse to place both spouses in the same department, division or facility *if the work involves potential conflicts of interest or other hazards greater*

[51 Cal.Rptr.2d 700, 913 P.2d 909] is perhaps the best known in this state. There, a landlord, a devout Presbyterian, did not want to rent any of her four units to unmarried couples, believing " 'it is a sin for her to rent her units to people who will engage in nonmarital sex on her property.' " (*Id.* at p. 1151.) While the case generated four separate opinions from a seven-justice court, not a single justice questioned the idea that the defendant had contravened the statute against marital status discrimination.[9]

Other clear examples of marital status discrimination are a refusal to hire unwed mothers because they were unwed, a refusal to hire single people because they were single, or the granting of maternity leave to married teachers only. (See *Cybyske v. Independent School District No. 196* (Minn. 1984) 347 N.W.2d 256, 261, fn. 4; see also *State Division of Human Rights v. Village of Spencerport* (1980) 78 A.D.2d 50 [434 N.Y.S.2d 52, 52-54].)

Judges have disagreed, however, in the general area of antinepotism rules, i.e., what can (or should) an employer do when two coworkers are married to one another. The high courts of Hawaii (*Ross v. Stouffer Hotel Company* (1994) 76 Hawaii 459 [879 P.2d 1037, 1041]),[10] Minnesota (*Kraft, Inc. v. State* (Minn. 1979) 284 N.W.2d 386),[11] Montana (*Thompson v. Board of Trustees, School District No. 12* (1981) 192 Mont. 266 [627 P.2d 1229]),[12]

---

for married couples than for other persons." (Cal. Code Regs., tit. 2, § 7292.5, subd. (a)(2).) On the other hand, "If co-employees marry, an employer *shall* make reasonable efforts to assign job duties so as to minimize problems of supervision, safety, security, or morale." (Cal. Code Regs., tit. 2, § 7292.5, subd. (b), italics added.) We are spared in this decision any need to address the potential overlap between separating spouses (as allowed by subdivision (a) of the regulation) and making reasonable efforts to minimize problems of supervision, safety, security or morale (as required by subdivision (b)) of the statute.

[9]As Justice Baxter said in his concurring and dissenting opinion, "the statute has consistently been interpreted as prohibiting discrimination in housing accommodations against unmarried cohabiting heterosexual couples." (*Smith v. Fair Employment & Housing Com.,* supra, 12 Cal.4th at p. 1218 (conc. & dis. opn. of Baxter, J.).)

[10]There, a resort fired a massage therapist when he got married to the principal massage therapist, because the resort had a no-relatives-in-the-same-department policy. The court said that an "extremely restrictive reading of the statute ignores the simple fact of life that when a person marries, it is always to a particular person with a particular 'identity.' " The employer did not dispute "that under its no-relatives policy, [the plaintiff] would not have been discharged had he not married [his wife, the principal massage therapist], but had instead chosen to remain single and continue living with her out of wedlock." (*Ross v. Stouffer Hotel Company, supra,* 879 F.2d at p. 1042.)

[11]In *Kraft,* part-time employees of a large corporation sought full-time positions, but were barred by a company policy prohibiting full-time employment of more than one family member. The high court saw the prohibition as an "arbitrary classification." (*Kraft, Inc. v. State, supra,* 284 N.W.2d at p. 388.) The court also stated that "[w]e reject the view that 'marital status,' while it denotes the fact that one is or is not married, does not embrace the identity or situation of one's spouse." (*Ibid.*)

[12]In *Thompson,* a high school principal and a school superintendent, each of whom was married to classroom teachers in the district, were respectively demoted and fired when the

and Washington (*Washington Water Power Co. v. State Human Rights Comm'n* (1978) 91 Wash.2d 62 [586 P.2d 1149]),[13] have all struck down antinepotism policies in various forms on the ground that they penalized the status of marriage.

The most thoughtful of these opinions is probably that of the Hawaii Supreme Court, *Ross v. Stouffer Hotel Company, supra,* 879 P.2d 1037. The court made a point of demonstrating that if the employee couple in that case had not gotten married, one of them would not have lost his job. (See *id.* at p. 1041.) The "event that caused [the new husband] to be discharged, therefore, was the change in his marital status . . . ." (*Id.* at p. 1042.)

On the other hand, the high courts of Alaska (*Muller v. BP Exploration (Alaska) Inc.* (Alaska 1996) 923 P.2d 783),[14] Illinois (*Boaden v. Department of Law Enforcement* (1996) 171 Ill.2d 230 [215 Ill.Dec. 664, 664 N.E.2d 61]),[15] Michigan (*Miller v. C.A. Muer Corporation* (1984) 420 Mich. 355

---

school board passed a rule that no administrator could have a spouse working in the school system. The court applied a "liberal definition of the term 'marital status' as used in [the relevant] statutes, includes the identity and occupation of one's spouse." (*Thompson v. Board of Trustees, School District No. 12, supra,* 627 P.2d at p. 1231.)

See *European Health Spa v. Human Rights Commission* (1984) 212 Mont. 319 [687 P.2d 1029]. In *European Health Spa,* a health club salesperson was married to a club manager. The club fired both of them, and the court upheld an administrative finding that the firing was in contravention of the statute prohibiting marital status discrimination; the reasons for the firing (that the husband was involved in a kickback scheme on sales commissions) were pretextual.

[13]The employer there had a policy of refusing to hire the spouse of another employee and, when two employees married, one would be fired (the couple was given the choice of which one). (See *Washington Water Power Co. v. State Human Rights Comm'n, supra,* 586 P.2d at p. 1151.) The court upheld an administrative rule holding that such a policy contravened the state marital status discrimination statute; the opinion is basically an explanation of the court's deference to the administrative agency. (See *id.* at pp. 1152-1154.) See also *Kastanis v. Educational Employees Credit Union* (1994) 122 Wash.2d 483 [859 P.2d 26, 29] (simply following *Washington Power* for proposition that marital status discrimination "also applies to antinepotism policies based on the identity of an employee's or applicant's spouse").

[14]An antinepotism policy prohibited one spouse from supervising another. (See *Muller v. BP Exploration (Alaska) Inc., supra,* 923 P.2d at pp. 785-786.) When coworkers married, they were forbidden from working the same shift. Both ultimately resigned because of the policy. Construing marital status according to its plain meaning, the court reasoned that "[e]xtending the reach of the anti-discrimination law to employment decisions based on to whom a person is married would change the focus of the law from discrimination based on broad categories, which can give rise to demeaning stereotypes and biases, to a highly individual factor." (*Id.* at p. 791.)

[15]A married couple who were police officers was prohibited from working on the same shift in the same patrol area. They challenged the police department policy as contrary to prohibition on marital status. The majority opinion held that "marital status discrimination does not encompass policies based on the identity of one's spouse," reasoning that, "In our view, a policy prohibiting spouses from working together presents an entirely different kind

[362 N.W.2d 650, 44 A.L.R.4th 1035]),[16] New York (*Manhattan Pizza Hut, Inc. v. New York State Human Rights Appeal Board* (1980) 51 N.Y.S.2d 506, 434 N.Y.S.2d 961 [415 N.E.2d 950]),[17] and West Virginia (*Townshend v. Board of Education* (1990) 183 W.Va. 418 [396 S.E.2d 185]),[18] have all upheld varieties of antinepotism rules. Basically, they have reasoned that marital *status* is independent of the *identity* of one's spouse.[19]

of harm than discrimination based on a individual's legal status." (*Boaden v. Department of Law Enforcement, supra,* 664 N.E.2d at p. 65.)

[16]There the court upheld policies that precluded married coworkers from working in the same restaurant or department. The Michigan Supreme Court said that "The relevant inquiry is *if* one is married rather than *to whom* one is married." (*Miller v. C. A. Muer Corporation, supra,* 362 N.W.2d at p. 653.) Thus marital status did not include the "identity, occupation and place of employment of one's spouse," and therefore the policies at issue did not facially violate the statute. In the last two paragraphs at the end of the opinion, however, the court allowed for the possibility that an antinepotism policy might be a "pretext for impermissible discrimination," though the court did not elaborate how that could be. (*Id.* at p. 655.)

In *Whirlpool Corporation v. Civil Rights Commission* (1986) 425 Mich. 527 [390 N.W.2d 625], the court considered a rule that a corporation would not hire anyone whose spouse already worked for it. The majority held that the rule did not implicate marital status discrimination because "It is different treatment based on the fact that one's spouse works in the same place as the applicant," thus "[m]arital status is irrelevant to the employer unless there is a spouse already working for the employer." (*Id.* at p. 627.)

The dissent, however (and it is a remarkable dissenting opinion because it reads like a majority opinion that simply couldn't get enough votes, as betrayed by the fact that the dissent is the sole statement of the facts given by the court), suggested that the applicants were treated differently "on the sole basis that their spouses are current employees." (*Whirlpool Corporation v. Civil Rights Commission, supra,* 390 N.W.2d at p. 631 (dis. opn. of Archer, J.).) In that sense the dissent gave the same rationale as the majority opinion by the Supreme Court of Hawaii in *Ross*. The dissenters also considered the "identity, occupation and place of employment of one's spouse," language from *Miller* to be dicta.

[17]The case concerned an antisupervision rule for married coworkers at fast-food restaurant, which was held not to contravene the statute. The New York high court said that the "ordinary meaning of 'marital status' is the social condition enjoyed by an individual by reason of his or her having participated or failed [*sic*] to participate in a marriage." (*Manhattan Pizza Hut, Inc. v. New York State Human Rights Appeal Board, supra,* 415 N.E.2d at p. 953.) The court also stressed, as the West Virginia court would later, the practical benefits of antinepotism rules, asserting that "even where a supervisor makes prodigious and even successful efforts to be evenhanded, the perception that he or she may have been influenced by a close relationship with a supervisee may tend to undermine morale and efficiency." (*Id.* at p. 965.)

[18]There a school board transferred a teacher from a school where his wife was principal because the board had a no-supervisory-relationship rule. The court held that the transfer was within the board's discretion because antinepotism rules have the "laudatory" purpose of preventing conflicts and favoritism. In a short discussion on the marital status argument, the court said that "the state of being married or single, is not the reason for [the teacher's] transfer. Rather, Mr. Townshend is to be transferred because of his personal relationship with the newly appointed principal." (*Townshend v. Board of Education, supra,* 396 S.E.2d at p. 189.)

[19]A position specifically attacked in the *Ross* opinion from Hawaii. Referring to the dissent, the majority said, "That extremely restrictive reading of the statute ignores the simple fact of life that when a person marries, it is always to a particular person with a particular 'identity.' " (*Ross v. Stouffer Hotel Company, supra,* 879 P.2d at p. 1041.)

Then there are what might be called the "conduit" cases. That is, the plaintiff is the object of adverse action because of something *about* his or her spouse, independent of whether the spouse works for the same employer, as such.

Conduit cases may be divided again into two categories: those in which the animus directed against the plaintiff's spouse is itself unlawful, and those in which the animus is not unlawful. The classic fact pattern involving unlawful animus may be found in *Bryant v. Automatic Data Processing* (1986) 151 Mich.App. 424 [390 N.W.2d 732], where a White woman married to a Black man was denied a permanent position as a secretary for a corporation *because* she was a White woman married to a Black man.

The *Bryant* case is instructive because the Michigan Supreme Court had already made clear, in *Miller v. C.A. Muer Corp., supra,* 362 N.W.2d 650, 653, that marital status discrimination did not apply to the "identity" of one's spouse. And it was on that basis that the trial court had granted the employer's summary judgment motion in *Bryant.* (See *Bryant v. Automatic Data Processing, supra,* 390 N.W.2d at p. 734.) But the Michigan Court of Appeals distinguished *Miller*: The plaintiff's complaint was based on having been the object of adverse action where *race* was a "motivating factor." (*Id.* at p. 735.)

Conduit cases not based on some wrongful animus, however—simple politics is the typical example—have been universally met with rejection as valid marital status discrimination claims. Perhaps the best explanation for that is this: In such cases, the marriage *qua* marriage is irrelevant to the adverse action taken by the employer. What the employer really cares about is the substantive relationship between the plaintiff and someone else, be he or she spouse, romantic partner, or even "just a friend."

Three cases illustrate the "political" animus point. In *State Division of Human Rights v. Village of Spencerport, supra,* 434 N.Y.S.2d 52, a part-time secretary to the town mayor was married to an unpopular tax assessor. She was fired because *he* had recently raised assessments on recently remodeled properties. The New York intermediate appellate court held there was no marital status discrimination because the discharge "was just as certain whether the assessor was her husband, or her brother, father or some other relative." (*Id.* at p. 54.) It was "political retaliation," and in the absence of some other reason to make the political retaliation unlawful, discharging her for the unpopularity of her husband did not contravene the marital status discrimination statutes.

Likewise, in *Bammert v. Labor and Industry Review Commission* (1999) 232 Wis.2d 365 [606 N.W.2d 620], a store employee was fired when "her

husband, a police sergeant, had participated in the arrest of her employer's wife." (*Id.* at p. 621.) The Wisconsin intermediate appellate court held that no marital status discrimination occurred because "the emphasis" behind the law outlawing marital status discrimination "is to prevent discrimination against classes of people, whether by age, race, . . . marital status or any of the other classes protected by the statute." It did not extend to " 'the status of being married to a *particular* person.' " (*Id.* at p. 625, italics added.)

Finally, and most recently, the Florida Supreme Court reached the same conclusion in a case where the employee of a large company was fired when his wife, a former employee of the company, sued the company for sex discrimination. (*Donato v. American Telephone and Telegraph* (Fla. 2000) 767 So.2d 1146, 1147-1148.) The court reasoned that marital status did not include "specific identity or actions of an individual's spouse" and thus concluded that the company had not contravened the marital status discrimination statute. (*Id.* at p. 1155.)

■ In the present case, Chen's claim clearly falls into the "political animus" category. There is no hint that she was the object of any adverse action because the office didn't like the fact she was *married* to a White man (or Black man, or Asian man or anybody else). Any arguable adverse action was the result of having a relationship (whether married or not) with a *particular* man, and not just because he was a fellow employee, but because he was allegedly on the "outs" with the then regnant management of the district attorney's office. Management's disapproval of Chen's relationship with Rutledge was thus blind to whether they were married or not.

Chen's argument that the marital status discrimination statute should be construed "broadly" is unavailing because, even assuming that the statute should be construed as "broadly" as reasonably possible,[20] she still loses. The point is illustrated by two cases from Minnesota, where the states' marital status discrimination statute is construed very broadly indeed.

In *Kraft, Inc. v. State, supra*, 284 N.W.2d 386, the state high court explicitly rejected a "narrow definition of marital status," in the context of

---

[20]Broad construction is a theme in the cases which have struck down antinepotism rules, as well as (predictably) a theme in Chen's argument here. And it is true that some commentators have tried to characterize the disputes in the antinepotism area as a debate between "broad" and "narrow" views of the statute. (E.g., Note, *Prohibiting Marital Status Discrimination: A Proposal for the Protection of Unmarried Couples* (1991) 42 Hastings L. J. 1415, 1419-1427.) In our view the "broad-narrow" characterization is a false dichotomy, because it ignores context.

Likewise, there is a similar semantic problem in the tendency of courts to use the word "identity" in defining the ambit of marital status discrimination, either when they say that it includes, or does not include, the "identity" of one's spouse. "Identity" is an ambiguous term, because it can entail generic and particular situations. That is, it can encompass the "identity"

an antinepotism policy, reasoning that in areas where there was a predominant employer, "two similarly situated individuals" might be forced by "economic pressures" to "forsake the marital union" and live together in violation of the (then still on the books) anticohabitation statute. (*Id.* at p. 388.)[21]

Five years later, however, the Minnesota high court was faced with a situation where a substitute teacher was not hired by one school district *not* because of some antinepotism policy but because of the "pro-teacher" views of her husband, who was on the board of a neighboring school district. (*Cybyske v. Independent School District No. 196, supra,* 347 N.W.2d at pp. 258-259.) The Minnesota high court noted that it construed the marital status discrimination statute broadly (*id.* at pp. 260-261), but concluded that the " 'political status' of one's spouse" was not protected under the state civil rights act. The legislature did not "intend to proscribe a particular political posture, whether of an employee or of the employee's spouse," under the state civil rights statute; and the court was not going to construe the term marital status to "include what the legislature excluded." (*Ibid.*; see Code Civ. Proc., § 1858 ["In the construction of a statute or instrument, the office of the Judge is . . . not to insert what has been omitted . . . ."].) The substitute teacher had no cause of action for marital status discrimination.

The point of *Cybyske,* of course, is that even a broad construction of the marital status discrimination statute does not entail a cause of action for some adverse action based on some political reason. We need only add that such a result is perfectly consonant with the approach of other states who have taken a similarly broad view of their statutes. Typically, as in the Hawaii Supreme Court's *Ross* decision, courts of those states have found dispositive the fact that something happened in the immediate wake of the marriage that would not have happened if the couple had remained single,

---

of one's spouse as a generic coworker, supervisor, or supervisee, as well as situations where a spouse is a *particular* person.

Hence we do not, unlike other cases that have addressed this area, attempt to formulate any generalized rules about whether California's marital status discrimination statute should be construed "broadly as distinct from according to its plain meaning," or whether the statute implicates or does not implicate the "identity" of one's spouse. It is enough to say here that in this context—political repercussions from a relationship within the office—the statute is not implicated even if it *is* construed broadly.

[21]The reader may note the similarity to the rationale in *Ross,* except that the Minnesota court was rather more aghast at any policy that encouraged people to stay living in sin (an old-fashioned phrase for cohabitation that we use without any pejorative intent at all) rather than marry. The Minnesota court quickly made a reference to the "preferred status enjoyed by the institution of marriage" (*Kraft, Inc. v. State, supra,* 284 N.W.2d at p. 388), a thought that seems to contradict the marriage-neutral emphasis of statutes prohibiting discrimination based on marital status, including singleness.

even if they were cohabiting. Yesterday you are cohabiting and everything was okay; today you got married and now you are out of a job.[22] The court could thus point to a change in marital status as the precipitant of the adverse action. In the political cases, by contrast, the animus is really directed at the relationship with the person, and is—the instant case is a perfect example of it—wholly marriage-neutral.[23]

Quite apart from the common law of marital status discrimination, Chen also relies on a state regulation, title 2 of the California Code of Regulations, section 7292.2, which provides that "Marital status discrimination may be established by showing that an applicant or employee has been denied an employment benefit by reason of: [¶] . . . [¶] (c) The employment or lack of employment of an applicant's or employee's spouse."

First, the obvious intent of this regulation does not support, as Chen would have us believe, an "identity" theory of marital status discrimination. The reference to "employment or *lack* of employment" signals that the purpose of the regulation was to prevent employers from trying to lower their own employee benefit costs by discriminating in favor of employees or applicants whose spouses themselves have spousal benefits. Say an employer is deciding whether to hire A or B, but A's spouse's employer has a generous medical benefits plan, while B is single. The employer might be tempted to hire A solely on the basis of the spouse's *employment*, because if A ever gets sick, the cost might be picked up by A's spouse's employer. By the same token, the employer might be tempted not to hire B because of the lack of employment of a spouse, because if B gets sick, the employer's own medical benefits plan will almost certainly bear the cost. To give in to that temptation is a no-no according to the regulation.[24]

---

[22]See also Justice Compton's dissent in *Muller v. BP Exploration (Alaska) Inc., supra,* 923 P.2d 783. Justice Compton stressed the *categorical* nature of the antinepotism policy: "Pursuant to company policy, any BP employee who supervises a spouse or is supervised by a spouse must be transferred or terminated. BP's policy therefore discriminates based on marital status." (*Id.* at p. 793 (dis. opn. of Compton, J.).)

[23]A point also illustrated by Justice McMorrow's concurring opinion in the *Boaden* case in Illinois. Justice McMorrow specifically noted that the Illiniois Human Rights Commission had concluded, in the antinepotism context, that concerns " 'about imposing discipline, morale problems and alleged conflicts of interest all appear to be based upon *stereotypes with respect to spousal behavior.*' " (*Boaden v. Department of Law Enforcement* (1996) 171 Ill.2d 230, 215 Ill.Dec. 664 [664 N.E.2d 61, 71] (conc. opn. of McMorrow, J.), italics added, quoting *In re Burton* (1984) 13 Ill.Hum.Rts. Comm'n Rep. 246, 252-253.) In the political cases, by contrast, there really is no stereotyping. The animus is directed at the fact there is a relationship, marital or not.

[24]There are, of course, other scenarios, also removed from an "identity" theory of marital status discrimination. Suppose an employer has a belief that wives shouldn't work in the paid workforce. He (by definition, there's no need for the usual gender-neutral "he or she" here)

Second, the text of the regulation does not support an identity theory either. The words "by reason of . . . [¶] . . . [¶] [t]he *employment . . .* of an applicant's or employee's spouse" (Cal. Code Regs., tit. 2, § 7292.2, italics added) focus on the *status* of the spouse's employment or lack thereof, not the particular identity of the spouse. "Employment" doesn't mean "identity," and shouldn't be tortured into becoming a sloppy synonym for it.

Third, even if we were, for sake of argument, to indulge the idea that somehow the regulation does imply an identity theory of marital status discrimination—say in the sense that the *Ross* decision stands for an identity theory of marital status discrimination—the nature of the "identity" targeted by the regulation does not encompass political disfavor. Chen has never alleged or argued, for example, that she got bad assignments merely because of Devallis Rutledge's "employment" as such. Had he been a nonattorney working in the mailroom it is pretty obvious that no one would have cared. It wasn't the fact that two employees working in the same office together were married (i.e., the identity of one's spouse as an employed person in the office) that generated this lawsuit, it was the fact that one of them happened to be politically on the "outs" with management and his spouse was allegedly being punished for it. As *Cybeske* shows, state antimarital status discrimination statutes *can* target discrimination based on the "identity" of one's spouse without reaching animus based on political disfavor.

Finally, we must also note in passing that there is a wholly different theory in the political animus area that lies beyond the fringe of marital status discrimination. Two federal circuit courts have divined First Amendment implications in actions against spouses where the animus was directed at a particular person because of some attribute of that person that was political: *Adler v. Pataki* (2d Cir. 1999) 185 F.3d 35 and *Adkins v. Board of Educ. of Magoffin County, K.Y.* (6th Cir. 1993) 982 F.2d 952.

In *Adler,* a high-ranking state in-house counsel claimed he was fired because his wife sued the state attorney general's office claiming she was fired because she was not a Republican. The Second Circuit Court of Appeals treated the claim as a burden on his "First Amendment right of intimate association" (*Adler v. Pataki, supra,* 185 F.3d at p. 44) and reversed a summary judgment in favor of the employer because it was possible that the firing was an action "solely in retaliation for [the employee's] wife's litigation activity." (*Id.* at p. 45.)

In *Adkins,* a high school secretary, whose husband was also the principal of the high school, was fired by the superintendent because she refused to

---

might be tempted to hire, as between two similarly qualified male applicants A and B, A, whose spouse is a full-time homemaker, and not B, whose spouse is an overworked associate in a law firm. That is, the decision would be made based on the "employment" or "lack of employment" of the applicant's spouse.

snitch on a teacher whom the superintendent wanted fired (by collecting how many days this particular teacher was late). Her husband was demoted to health teacher. The court considered the claim to be one of "infringement of the constitutional right of privacy and association," and reasoned that the secretary could not be fired "for exercising her First Amendment right to freedom of association." (*Adkins v. Board of Educ. of Magoffin County, K.Y.,* supra, 982 F.2d at p. 955.) In fact, the court went out of its way to say that the case was not "pursuant to a board policy against one spouse reporting to or working under the supervision of the other spouse." (*Id.* at p. 958.) It was for the superintendent's "own goals and unrelated to any Board policy." (*Ibid.*)

We need not deal with the constitutional theory in this case, except to note that neither *Adler* nor *Adkins* was based on marital status discrimination, and therefore cannot be of any avail to Chen here. In fact, the day before Chen rested her case, she made a motion to amend according to proof, seeking to add a cause of action for violation of her right of intimate association. The motion was denied the next day and Chen presents no argument in this appeal that the court's denial of the motion was an abuse of its discretion.

### B. *The Retaliation Claim*

■■■ Antiretaliation statutes are a necessary concomitant for antidiscrimination statutes, lest they be easily circumvented. Consider the hypothetical employer who seeks to preempt any discrimination claims by making it painful to make the claim in the first place: "What? Complain of discrimination? We have an equal opportunity policy for everyone who complains, regardless of his or her race, color, nationality, marital status, etc. That policy is, you're fired." Hence section 12940, subdivision (h): "It shall be an unlawful employment practice . . . . [¶] . . . [¶] (h) For any employer . . . to . . . discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

On the other hand, the possibility of a retaliation claim creates the problem of conferring a de facto immunity on the complainant despite poor job performance or the meritlessness of any complaint. Consider a hypothetical of a ne'er-do-well employee who wants to manipulate the system to his or her advantage: "Not doing your job well? Ax about to fall? Never fear: file a discrimination claim, no matter how meritless. Your employer will be afraid to take any action because now you can sue for retaliation."

Accordingly, courts have balanced the state interest in protecting the *right* to complain against discrimination while at the same time protecting

employers from meritless discrimination claims by requiring a *causal link* between what the labor lawyers call the "protected activity" (e.g., filing a complaint) and the adverse action (e.g., not getting a promotion). (See *Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 217 [51 Cal.Rptr.2d 642]; *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 614 [262 Cal.Rptr. 842].)

 Significantly, the necessity of a causal link is a part of a plaintiff's *prima facie* case of retaliation. (*Fisher v. San Pedro Peninsula Hospital, supra*, 214 Cal.App.3d at p. 614.) Only after such a prima facie case is made does the case progress to the familiar burden-shifting analysis typically used to test discrimination claims on the merits: Once the prima facie case is made, the employer then has the burden of coming forward with a legitimate reason for the action, and the plaintiff then has the burden of demonstrating that that reason is merely a pretext. (E.g., *Addy v. Bliss & Glennon, supra*, 44 Cal.App.4th at pp. 215-216; *Johnson v. University of Wisconsin-Eau Claire* (7th Cir. 1995) 70 F.3d 469, 479.) Thus the failure to present facts establishing a prima facie case justifies a grant of a motion for nonsuit. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354-355 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203-204 [48 Cal.Rptr.2d 448].)

 Here is where the chronology of Chen's career is important. She never complained about discrimination against her, whether by virtue of race, gender or marital status, until the summer of 1997. The only action taken after those complaints was the fact that she was denied a promotion from level III to level IV in the context of a limited number of openings in a crowded field at a time when she was on an indefinite stress leave.

And while she certainly had every right to compile, in 1994, statistics showing disparate rates of promotion between men and women, she never filed a complaint on a disparate impact theory. Just reporting some statistics doesn't mean that if you don't get promoted afterwards it was in retaliation for reporting the statistics.

A related theme in Chen's brief is that during her early days of trying to get on the felony panel she was passed over in favor of deputies with lower conviction rates. The subtext of Chen's argument is that only conviction rates should have counted in considering who to send to the felony panel. That is a particularly unpersuasive point for a lawyer to make, because it ignores the tremendous variation in legal work, even that within the same office. In a large urban district attorney's office, you cannot compare relative "conviction rates" between major felonies, three strikes cases, "prelims"

(where the defendant cannot be "convicted" in any event) or juvenile dependency dispositions on a simplistic across-the-board basis.

The argument also assumes, quite wrongly, that lawyers make *all* the difference in outcomes, as if the merits of a case or the interests of justice didn't count for much. (In reality it should be the other way around to the degree that it is true at all.) All judges regularly see cases where the better lawyer *rightfully* lost because he or she *should* have lost, regardless of skill. (And that is by whatever criteria you choose to measure relative legal skill, e.g., perceptivity, knowledge, organization, or ever plain diligence.) In any sane system of justice, the merits, rather than the skill of lawyers, should control the ultimate disposition.

Moreover, we also all know that lawyer win-loss rates can be manipulated. Settle all the hard ones and take the easy ones to trial. Thus one cannot say that a high-conviction rate, by itself, means very much, and it certainly doesn't create any *entitlement* to a promotion for a deputy district attorney.

Ironically for a deputy who prided herself on a high conviction rate, though, another of Chen's themes is that she was the object of retaliation because in at least two instances she sided with a defendant, either advocating the dismissal of the case against him or in one instance simply dismissing it. For this she now claims she was retaliated against because she was "criticized" by her superiors. The theory is that because prosecutors have ethical duties not to prosecute individuals they believe to be innocent (roughly analogous to a civil lawyer's duty not to bring a meritless lawsuit), this "criticism" amounted to retaliation for "protected activity."

There are at least two answers to this: One, the retaliation statute is a civil rights law, and was not written to protect deputy district attorneys who have disagreements with management about how a given case should be handled. The salient language in the statute refers to "practices forbidden *under this part*" and "this part" isn't referring to the portions of the professional code governing the ethical duties of prosecutors.

Two, Chen's argument is predicated on the assumption that she was so absolutely correct in her disagreements with management about the two cases that even mere *criticism* of her position could amount to "retaliation." Again, that is a particularly unpersuasive argument coming from a lawyer, who would certainly know that lawyers disagree about cases. It appears to have never occurred to Chen that maybe, just maybe, she was wrong.

In any event, when one looks at what Chen did "under this part"—that is, by way of making a civil rights complaint—the fact is that she did nothing

until her conversations in the summer of 1997 to allege any discrimination *against her*, and the only thing that happened after that was she didn't get promoted at a time when she was on indefinite stress leave, and was still lower in seniority than the majority of those applying for the promotion. If anything, given Chen's checkered work record, her willingness to subordinate her deputy district attorney's job to her bond trading and nascent acting career, and the malleability of her purported "stress" (on when convenient, possibly off when convenient), the only rational conclusion is that a promotion over more senior and available attorneys would have been *undeservedly favored treatment.*

### C. *The Race and Gender Discrimination Claims Sent to the Jury*

■ Chen does not argue that the evidence was insufficient to support the jury's finding that she was not the object of race or gender discrimination. Rather, she complains of a number of discrete errors supposedly committed by the trial judge.

### 1. *Evidence Exclusions*

First Chen complains about various evidentiary exclusions made during the course of the trial:

(1) Chen claimed that six other non-White attorneys, including her nemesis Karen Whetmore, were "not promoted at the same rate as white males." Essentially, she wanted to present anecdotal evidence of their careers.

The trial court was, however, within its discretion to exclude the anecdotes, given the theory of Chen's case. (See generally Evid. Code, § 352.) Chen had not framed her pleadings in terms of some sort of systematic discrimination by the office, but rather in terms of the office's treatment of her specifically. To have allowed anecdotes of how a select group of non-White employees were treated would have expanded the scope of the trial exponentially. The court would have had to allow, to be fair to the district attorney's office, an exploration into the careers of *every* non-White employee who had worked for the office over the past few decades (or at least under Capizzi's administration), and maybe even every employee, regardless of race or sex, so as to show that the office was treating similarly situated deputies similarly.

(2) Chen was allowed to present statistical evidence concerning the racial and sexual makeup of the office's management,[25] but now claims that it was error for the court to have excluded evidence concerning the percentage of non-White students at several local schools, which supposedly would have impeached Capizzi's testimony to the effect that one explanation for what Chen claimed was a disproportionate number of Whites in the office was the relative percentages of various groups graduating from "law schools."

Chen misstates the record. She *was* allowed to present evidence before the jury concerning the number of non-White students at three local law schools for some years in the late 1990's in the context of impeaching Capizzi.

(3) Similarly, Chen complains that she was not allowed to ask Harper three questions generally touching on the office's hiring policies: (1) "How many ethnic minorities were available for hire at the time that you were conducting your recruitment function in 1991 or 1992 or 1993 or 1994?" and (2) "Do you know what percentage of the applicants to the district attorney's office" in "the years 1991, 1992, 1993, or 1994" were "from ethnic minorities?" and (3) "Do you have a recollection of the number of ethnic minorities at Southwestern [University School of Law] in 1996?"

The first two questions were hopelessly compound. The last question was irrelevant, if only because it assumed that the number of non-White *applicants* to the Orange County District Attorney's Office would mirror the number of non-White *students* at just one of many Southern California law schools. (Any number of factors might skew that analysis, including whether affirmative action programs at major law firms (who can pay more) or for law school faculties (who offer better work conditions, including not having to worry about one's "conviction rate") would artificially depress the number of non-White applicants to the district attorney's office.)

### 2. *Evidence Inclusions*

On the other hand, Chen also complains about a series of questions by the trial judge and by the defendants' attorney as to whether Chen's race, gender

---

[25]This evidence—which the trial judge allowed in—would not exactly merit an A grade in a social science class. All it showed is that the Orange County District Attorney's Office had a lot more White males in it, proportionately speaking, in the early 1980's than in the early 1990's (which is exactly what you'd expect if the office wasn't discriminating), and that the office was hiring men and women in roughly equal numbers in the early 1990's (again, what you'd expect if the office wasn't discriminating). To the degree that the evidence also showed that there were proportionately more White males in senior positions in the 1990's, the presumptive answer is that that disproportionality reflects who was hired in the previous decades (the '60's and '70's), when women and non-Whites were not graduating from law schools in the same percentage as they graduated in later decades.

or even association with Rutledge was ever mentioned in any discussions concerning her assignments or promotion. However, because she didn't object to *any* of these questions, any argument based on them has been waived.

Her brief also makes a passing reference to certain jury instructions that the court refused, but only in the context that these rejected jury instructions "compound[ed] the problem," (and that is *all* she says about jury instructions in her opening brief). Since she has not presented anything close to a legal argument showing any sort of prejudicial error as regards these instructions, any point as to them has been waived as well.

### 3. *Striking Portions of Her Husband's Testimony*

Finally, Chen claims that the trial court erred in refusing to allow her to ask her husband, Devallis Rutledge, if he had been able to determine whether males or females were promoted faster to the felony panel without first laying a foundation that his duties included any such observations "as part of his job."

The court was undeniably correct in imposing such a requirement. Otherwise, Rutledge would have only been giving his general impressions or opinion in a context where it would not have been clear that he had access to all the relevant data.

### D. *The Cross-appeal*

■ Each of the defendants sought attorney fees under section 12965, subdivision (b). ("In actions brought under this section, the court, in its discretion may award to the prevailing party reasonable attorney fees and costs except where such action is filed by a public agency or public official, acting in an official capacity.") Essentially they claimed, as they now do, that Chen's case was in fact "frivolous." The trial court denied the requests.

The issue will be dealt with summarily. As the trial judge himself noted, Chen's marital status claim was one of first impression in this state, her race and gender claims were strong enough to get to the jury, and she had at least some anecdotal evidence of "other people's problems" to support her race and gender discrimination claims. Given these facts we do not think the judge was beyond the bounds of reason in concluding that fees should not be awarded the prevailing defendants.

## IV. DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

Rylaarsdam, J., and Moore, J., concurred.

Petitions for a rehearing were denied March 14, 2002, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 15, 2002.