[No. G032967. Fourth Dist., Div. Three. June 18, 2004.]

HOPE INTERNATIONAL UNIVERSITY, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
CURTIS C. ROUANZOIN et al., Real Parties in Interest.

COUNSEL

Jackson Lewis, Benjamin S. Cardozo and Drew L. Alexis for Petitioner.

No appearance by Respondent.

Feldhake, August & Roquemore, Robert J. Feldhake and Dimitri P. Gross for Real Parties in Interest.

OPINION

SILLS, P. J.—

## I. INTRODUCTION

Hope International University (Hope), affiliated with the Church of Christ, fired two professors because of the perception that they had had an affair while one of the professor's divorce was still pending. Both Hope and the Church of Christ take a dim view of that sort of thing, and in any event the university holds its professors to an "abstain from all appearance of evil" standard from I Thessalonians 5:22. Ironically, both professors taught in the marriage and family counseling department. They sued for marital status discrimination, breach of their employment agreement, and for promissory estoppel because one of the professors had, years before, moved his clinical psychological counseling center to the campus. The university brought a motion for summary judgment or, in the alternative, a motion for summary adjudication. The trial court denied the motion for summary judgment and refused to even consider summary adjudication because the university had not organized its points and authorities by cause of action. The university petitioned for writ relief, and, because the case raised important issues concerning the extent of the "ministerial exception" in California (see *Schmoll v. Chapman University* (1999) 70 Cal.App.4th 1434 [83 Cal.Rptr.2d 426] [precluding judicial examination into the merits of the discharge of chaplain]), we scheduled an order to show cause on the question of the university's entitlement to summary judgment.

Our conclusions:

■ First, the trial court clearly erred in refusing to consider summary adjudication. Nothing in the governing rules requires the moving party to organize its points and authorities in support of a motion for summary judgment or, in the alternative, summary adjudication, by cause of action. In

fact, doing so (as in this case) takes valuable space from overarching substantive arguments that may apply to more than one cause of action.

Second, under the facts and procedural posture of this particular case, we cannot say *as a matter of law* that the ministerial exception applies. There is a genuine issue of material fact on this record as to whether the two professors really were "religious" employees.

Third, to the degree that the marital status discrimination claims are predicated on Hope's reaction to the *perception* (which might even have been an unreasonable one, more on that later) of an illicit relationship before the marriage, the claims are not viable as a matter of substantive marital status antidiscrimination law. To that degree the university's animus, reasonable or not, was not directed at their marriage as such, but at what their marriage was thought to *imply about past behavior*.

■ However, to the degree that the marital status discrimination claims are predicated on an a priori policy on the part of Hope that two people working in the same department could not be married to each other, the claims are viable. In a word, regulations governing California's marital status antidiscrimination laws are clear that marriage between two coworkers is not ipso facto a reason to get rid of one of them.

## II. FACTS

### A. *The School*

It would be an understatement to say that Hope International University is a religious institution. It is affiliated with the Church of Christ, meaning "those churches that are dedicated to the restoration of the New Testament Church in its ordinances, its faith and its life." The university looks to the Bible as its "ultimate constitution," and requires its professors to accept it "as the authoritative word of God." While professors can belong to various denominations, they must belong to at least one Christian denomination and be "involved with the life of the church" (presumably meaning "the church" in a generic, as distinct from specifically denominational, sense). The purpose of the school is to educate its students to "be equipped for a fruitful Christian service, and particularly for the Christian ministry."

Hope's faculty handbook imposes on its professors the role of Christian exemplar. As the handbook says, "What happens at a secretary's desk, in an administrator's office, in academic advising, around the table in the cafeteria, . . . etc. all contribute to the student's education and growth," and thus "it is imperative that our employees agree to abide by [our mission] in every

activity that might have an effect upon any of our students." Hence faculty are to "conduct both on and off-campus activities and relationships in a manner that models a demonstration of a growing Christ-likeness." Academic freedom is to be practiced only "within the context and constraints of the mission statement of the University."

The religious orientation carries over into Hope's employee handbook as it regards firing. A section on "Separation of Service" states that any faculty member may be terminated "immediately in the case of grievous moral failure." Reminiscent of the rule of ejusdem generis, the handbook does not attempt to define "grievous moral failure" but cites Exodus 20:1–17 and Galatians 5:19 as examples of expected moral behavior. Exodus 20:1–17 is where the first listing of the Ten Commandments may be found in the Old Testament. Galatians 5:19 provides: "Now the works of the flesh are manifest, which are these: Adultery, fornication, uncleanness, lasciviousness."

## B. *The Professors*

Which leads us to the case before us, which developed out of a perception of an extramarital affair between two of Hope's faculty members, both of whom taught, ironically enough, in the marriage and family therapy department. Both professors' teaching contracts indicated that they were to be guided by the faculty handbook.

One of the professors, Curtis Rouanzoin, is a licensed psychologist and marriage and family therapist with a doctorate in clinical psychology. He was a professor at Hope for over 20 years, and served most of those years as a tenured faculty member. He is the author of several articles in field psychology and holds various board certificates. Beginning in 1981, he served as chair of the undergraduate department of psychology, and by 1989 he chaired both the undergraduate and graduate departments. In 1998 he became chair of the graduate department in marriage and family therapy, and also served as assistant dean of the graduate school from 1999–2000.

In addition to teaching, Rouanzoin has a private practice in psychological counseling and marriage and family therapy known as Rouanzoin & Associates. In the early 1980's, when Hope decided to include a marriage and family therapy program on campus, its administrators solicited Rouanzoin to integrate his private practice with the school. In exchange for supervising Pacific Counseling Center's operations, Hope agreed to pay Rouanzoin a monthly stipend from which he could then pay staff salaries and expenses. This stipend was memorialized in an annual "Memorandum of Agreement" between Hope and Rouanzoin which set forth the monthly stipend to be paid for running the center over the next year. Once up and running, Pacific

Counseling Center provided low-cost counseling services to Hope's students, faculty, and members of the surrounding community, and allowed students in Hope's marriage and family therapy program to gain clinical experience.

Hope also provided Rouanzoin & Associates with office space at lower rent than what was otherwise charged for similar space. Rouanzoin paid (in his words) "tens of thousands of dollars" for substantial improvements to this space, including the installation of new carpet and the building of a reception area, a storage area, and various other offices.

As the director of the Pacific Counseling Center, Rouanzoin described his duties as: "oversight of the coordinator, of the intake personnel, of the supervisors, and the ongoing quality of the program with the Master's level students that were working through the counseling center." He would later explain that he was *not* a secular employee, but "a witness for the students for the university" meaning that he was required to educate "the students in their major while keeping the other foot in the mission of the university." In his declaration to the court, however, he indicated that although he integrated "Christian concepts" into his classroom,[1] as were noted on his syllabi,[2] he never taught religious classes, and did not view himself as a " 'religious' employee."

The other plaintiff, Lisa Riggs, has her doctorate in clinical psychology. She began working at the Pacific Counseling Center in 1994 where she served as the Coordinator for Clinical Training and as a registered psychological assistant. In 1995, she was placed in charge of coordinating the clinical training for Hope's marriage and family therapy students. She joined Hope's faculty in 1997, and became tenured in 2001. She taught both graduate and undergraduate courses, and later became Hope's director of continuing education.

Riggs declared that while she too integrated "Christian concepts" into her classroom, she was teaching psychology and other secular classes, and was never instructed to "teach the Bible classes." Her syllabus for a course in the Approaches to the Treatment of Children includes Hope's mission statement, and, as required by Hope, explains that the course "contributes" to Hope's

---

[1] His course syllabus for Psychopathology indicates that "scriptural approaches" would be integrated into the course, and that students should be able to explain various sorts of abnormal behavior according to "Christian integration." This syllabus also includes Hope's mission statement: "empowering students through higher education to serve the Church and impact the world for Christ."

[2] Hope requires that every syllabus indicate how the class addresses the mission of the university, and every publication produced for either on or off campus consumption includes Hope's mission statement.

mission. The syllabus also states one of the objectives of the course is to "help student[s] integrate their Christian faith into their understanding of treatment of children, particularly related to how therapy with children and their families relates to Christ's mission for his Church."

## C. *The Relationship Between The Professors*

Rouanzoin and Riggs worked together at Pacific Counseling Center in the marriage and family therapy program; while he oversaw essentially all of the clinic's operations, she was in charge of coordinating the clinical training for Hope's marriage and family therapy students.

Rouanzoin had been married to his former wife for 27 years when he filed for divorce in December of 2000. In early 2001, a rumor began circulating that Rouanzoin and Riggs were having an affair. Rouanzoin heard that another faculty member was spreading these rumors.[3] Both Riggs and Rouanzoin discussed these rumors with the provost and vice-president, and the dean of the school of graduate studies at the time. Riggs and Rouanzoin assured them that the rumors were false.

Rouanzoin informed the dean of his plans to divorce, and the dean expressed hopes that he and his wife could reconcile their differences. He also decided it was best if Rouanzoin step down as chair of the marriage and family therapy program. He felt that the divorce would give a *"perception that [he] was not credible to Chair the Marriage and Family Therapy department."* Rouanzoin stepped down from this position, but continued to teach. He was replaced by a married man. However, Rouanzoin was restored to his position of chair in December of 2001 after his divorce became final.

## D. *The Relationship Leads to Their Termination*

The reinstatement, however, was destined to be short-lived. It is undisputed that prior to his reinstatement, and just two weeks after the close of his divorce, Rouanzoin and Riggs did, in fact, begin dating. They were secretly engaged that December—the same month as Rouanzoin's divorce—and announced their engagement early the following year.

In February of 2002, Rouanzoin discussed his engagement to Riggs with Stanley Mutunga, dean of the school of graduate studies. Rouanzoin again denied having any "relationship" with Riggs prior to his divorce. Riggs assured the dean of the same.

---

[3] Reminiscent of the story of Suzanna and the elders in the Apocrypha, the rumors may have had their origin in Riggs's rebuff of the man's advances. Prior to the rumors being spread, Riggs filed a complaint against him for harassment.

One month later, in a letter dated March 13, 2002, Edgar Elliston, vice-president of academic affairs, informed Rouanzoin that he could no longer be in charge of the Pacific Counseling Center. Rouanzoin quickly wrote to Hope's president, Lawson, requesting an explanation, and an assurance that there was no hidden agenda behind the assertion that his control over the center was a "conflict of interest."

Lawson wrote back indicating that while Rouanzoin's decision to marry was his "personal business," it did "force the university to make decisions [it] would rather avoid." Lawson also noted that the *"perception* that [Rouanzoin had] abandoned [his] wife and sons and remarried a younger woman does damage to the reputation of a university that is committed to the sanctity of marriage." (Italics added.) He explained, however, that the decisions of Elliston and Mutunga regarding nonrenewal of his contract were made "to avoid any *perceived* conflicts of interests."

On March 24, Rouanzoin received another letter indicating that he needed to vacate the premises of the Pacific Counseling Center, and that the lease agreement with Rouanzoin & Associates was terminated effective May 31, 2002.

On April 1, Hope sent Rouanzoin yet another letter indicating that he would be issued a 10-month teaching contract, but not the responsibility to chair the marriage and family therapy program. On May 17, however, the dean notified Rouanzoin that after a review of his "status," the school had decided not to renew his teaching contract. Mutunga explained that this decision was based on his *perception* that Rouanzoin and Riggs had not been truthful to him when they denied their relationship, while Elliston said the university could not have a husband and wife in the same department.

The termination process of Riggs involved another issue. In the termination letter sent her, also dated May 17, the President indicated the nonrenewal of her contract was due, in part, to her resignation via e-mail from her full-time teaching status, and her request for adjunct teaching assignments. The papers on the summary judgment motion show various e-mails going back and forth between Riggs and Michele Willingham, dean of the school of professional studies, regarding the classes Riggs would be scheduled to teach the following term. Most of these messages involved Riggs trying to get schedule and contract information, and none of them indicated that she would be terminated.

Later (in papers opposing summary judgment) Riggs would counter the idea that she had resigned by explaining that after being elevated to "continuing contract" status, she was teaching more than any other professor at Hope, and had merely asked to reduce her teaching load for the 2002–2003 year. After the school increased the number of units for some of her classes from two to three, she requested permission to teach a reduced schedule for the 2002–2003 year so that she would be teaching her "preferred courses." She got that permission.

The ax fell during their honeymoon, on May 30, 2002. The newlyweds received an e-mail sent out to all faculty members to the effect that Hope would not be renewing Rouanzoin's and Riggs's contracts. According to a deposition taken of Elliston, one of the reasons that Riggs's contract was not renewed was because a husband and wife could not "mak[e] up the full-time department." (He said, in relationship to Riggs's nonrenewal: "A third thing [reason] was having a husband and wife essentially making up the full-time department, which was seen as inappropriate, irregardless of anything else— just a husband and wife as an academic department.")

### E. *The Lawsuit*

Rouanzoin and Riggs subsequently filed suit against Hope alleging:

—(1) marital status discrimination in violation of California's public policy against marital status discrimination;

—(2) wrongful termination of employment in violation of the Fair Employment and Housing Act for marital status discrimination;

—(3) wrongful termination in violation of California's public policy against marital status discrimination;

—(4) breach of contract for violation of an implied promise not to discriminate based on marital status and breach of contract for violation of their "continuing contracts" independent of marital status;

—(5) promissory estoppel; and

—(6) declaratory relief to the effect that no sums were due from plaintiffs to Hope in connection with their tenancy and operation of the Pacific Counseling Center.

Hope filed a motion for summary judgment, or in the alternative, summary adjudication of the issues. Both the summary judgment motion and the alternative summary adjudication motion were denied.

## F. The Writ Petition

Hope timely petitioned for a writ of mandate to vacate the trial court's decision, and we set an order to show cause to review the decision. As most lawyers know, not every denial of a summary judgment motion will prompt an appellate court to grant a hearing on the merits. In this case, though, three aspects of the trial judge's order in particular favored discretionary review by peremptory writ, and we take the liberty of specifying them now.

Most important is the nature of the ministerial exception. Because of the very nature of the exception, it entails an immunity on the part of a religious institution from the intrusive examination into religious doctrine inherent in the suit. Such an immunity implicates a somewhat stronger interest than the more typical writ situation where a litigant is simply asserting the right to win at the summary judgment level. (Cf. *Lauro Lines S.R.L. v. Chasser* (1989) 490 U.S. 495, 499–500 [104 L.Ed.2d 548, 109 S.Ct. 1976] [distinguishing the right not to face trial *at all* from the right not to be tried in a particular court, the former meriting immediate appellate review under federal law].) The very process of review itself threatens to entangle the court in a sectarian controversy. (See *Little v. Wuerl* (3rd Cir. 1991) 929 F.2d 944, 949 [where "inquiry into the employer's religious mission," the "process of review itself" can be "excessive entanglement"].)

Second, the trial judge's declining to rule on Hope's motion for summary adjudication because Hope had failed "to address the various causes of action in its points and authorities" also implicates an issue of continuing importance to all litigators in the state. Every day lawyers must decide how to structure their points and authorities in preparing summary judgment motions, and if the rule is that, in order to have an alternative request for summary adjudication considered by the court they must structure those points and authorities by cause of action, they certainly should know about it as soon as possible.

Third, the marital status discrimination claims implicated an issue touched on in this court's opinion in *Chen v. County of Orange* (2002) 96 Cal.App.4th 926 [116 Cal. Rptr. 2d 786], but only tangentially, namely the degree to which California's marital status antidiscrimination laws preclude employers from *automatically* assuming that coworkers cannot be married.

## III. Discussion

### A. *Does Rule 313(a) Require Points and Authorities to be Organized by Each Cause of Action for A Summary Adjudication Motion? No.*

Hope's points and authorities supporting its motion went 20 pages. Let us summarize that memorandum. The facts statement was very readable, went 12 pages, with the various aspects of the case broken into reader-friendly subheadings. In terms of simply getting the story across, it is a first-class piece of legal work.

The discussion section was likewise highly professional and readable, went eight pages, and, after a perfunctory two paragraphs telling the reader generally about summary judgment, was organized around four basic arguments that generally transcended the specific causes of action. Those four basic arguments were:

—(1) The First Amendment precluded the suit by way of the ministerial exception;

—(2) Hope was not an "employer" within the meaning of California's Fair Employment and Housing Law;

—(3) To the degree that the California Employment and Housing Law exempts "religious organizations" like a church but does not exempt religious institutions like religious colleges, the law violates standards of equal protection; and finally

—(4) The marital status discrimination claims had to fail as a matter of law.

What the points and authorities did not attempt to do is go cause of action by cause of action. On that basis alone the trial judge denied the possibility of summary adjudication.

■ In doing so the trial judge was in clear error. The trial judge cited rule 313(a) of the California Rules of Court for his decision, but by its terms that rule merely requires a memorandum of points and authorities in support of a motion, including a motion for summary judgment or, in the alternative, summary adjudication.[4] The contents of a memorandum are set forth in rule

---

[4] The text of rule 313(a) is: "A party filing a demurrer or motion, except for a motion listed in rule 314 [things like being relieved as counsel or petition for a change of name or gender]

313(b), which merely states that memorandums should have a statement of the facts and a "concise" statement of the law.[5] Memorandums for summary judgment or summary adjudication are limited, without leave of court, to 20 pages by rule 313(d), and even that is a dispensation over the normal limit of 15.[6]

Much of American law is obviously not organized or written for the convenience of the reader. Legislation often begins with long lists of definitions, meaningless to the reader at that point and contrived to require readers to continually flip back and forth between pages. Sentences in the codes are usually unnecessarily long, with synonyms heaped on each other so that by the time you reach the verb you have forgotten the subject of the sentence. Case law is sometimes not too much better. To this day some judges still routinely refer to parties by litigation designations which are wholly meaningless to a reader who was not part of the litigation in the first place and, particularly in the older appellate reporters, force the reader to flip back to the title of the case to figure out what was going on. ("Let's see, was the 'petitioner' the wife or the husband? Is the 'respondent' the "insurance company or the insured?") Some older cases, now thankfully mostly to be found in the California Appellate Reporter, Second Series, almost take delight in the impenetrability of their prose.

But that does not mean anyone trying to figure out the law can ignore poorly written statutes or cases. The law does not always come packaged for us as we would like, and as judges we must deal with it even if points and authorities are not always organized exactly to our convenience. (After all, lawyers have to do a lot more for our convenience as judges than we have to do for theirs!) There are times, of course, when the failure to present a point in an appropriate heading or subheading can substantively waive the point, particularly in an appellate brief (e.g., Cal. Rules of Court, rule 14(a)(1)(B)), but there is nothing in the rules or even common sense that should necessarily foreclose summary adjudication merely because a litigant's counsel chooses to organize a memorandum of points and authorities on some other basis than plodding down the line with each cause of action, seriatim.

---

must serve and file therewith a memorandum of points and authorities in support. The court may construe the absence of a memorandum as an admission that the motion or special demurrer is not meritorious and cause for its denial and, in the case of a demurrer, as a waiver of all grounds not supported."

[5] The rule provides: "The memorandum must contain a statement of facts, a concise statement of the law, evidence and arguments relied on, and a discussion of the statutes, cases, and textbooks cited in support of the position advanced." (Cal. Rules of Court, rule 313(b).)

[6] The rule provides in pertinent part: "Except in a summary judgment or summary adjudication motion, no opening or responding memorandum may exceed 15 pages. In a summary judgment or summary adjudication motion, no opening or responding memorandum may exceed 20 pages." (Cal. Rules of Court, rule 313(d).)

Indeed, in the present case, organization by cause of action could only have come at the cost of truncating the discussion of the overarching issues of constitutional and statutory law inherent throughout the case. And, as the memorandum was already at the maximum allowed without leave of court, that was a sound approach. The organizational structure preferred by the trial judge would have caused needless duplication and waste of space by making Hope list several distinct constitutional arguments under the heading of each cause of action, which in turn would force unnecessary subdivisions or the neglect of subheadings to make the points.

Under the trial judge's theory, the structure of the discussion section of Hope's points and authorities would have had to go something substantively like this: Heading: Marital Status Discrimination; subheading: ministerial exception makes cause of action unconstitutional in this case; subsubheading: Hope is not an "employer"; subsubsubheading: If Hope is an employer under the statute, then the statute is unconstitutional; subheading: Oh, and by the way, wrong on the merits.

That would finish up one cause of action, and the format would be repeated for the next: Heading: Wrongful termination; subheading: ministerial exception makes cause of action unconstitutional in this case; subsubheading: Hope is not an "employer"; subsubsubheading: If Hope is an employer under the statute, then the statute is unconstitutional; subheading: Oh, and by the way, wrong on the merits.

And so on. The pattern would have been repeated for the remaining four causes of action. The way that Hope chose to do it makes far more sense in terms of getting the main points across and in aiding the court in understanding the relevant law.

Thus by any reading of rule 313(b), Hope complied with it. We therefore hold that the trial judge erred in refusing to consider summary adjudication as distinct from all-or-nothing summary judgment.

That error by itself would merit granting the writ to the extent of forcing the judge to consider the possibility of summary adjudication. However, since issues of the constitutional scope of the ministerial exception and the statutory scope of the marital status discrimination statute are also before us, and would be reviewed de novo in any event, we now turn to them.

B. *Was Hope Entitled to Summary Judgment On the Basis
of the Ministerial Exception? No*

1. *The Established Scope of the Ministerial Exception*

a. *The Relatively Easy Cases*

■ The ministerial exception is, as our Supreme Court has noted, a "nonstatutory, constitutionally compelled" exception to federal civil rights legislation. (*Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 543–544 [10 Cal.Rptr.3d 283, 85 P.3d 67].) The idea is that the law should not be construed to govern the relationship of a church and its ministers. (*Id.* at p. 544.) As developed and applied by lower federal courts (the United States Supreme Court has not yet directly spoken on the subject), it applies to ministers and to "a variety of nonordained employees with duties functionally equivalent to those of ministers." (*Ibid.*) The doctrine was applied to state civil rights laws in *Schmoll* (see *Schmoll, supra,* 70 Cal.App.4th at pp. 1438, 1442–1444)—there is, after all, no reason why an exemption carved by the courts from federal civil rights laws should not also apply to their state analogs.

The "ministerial exception" was first articulated in *McClure v. Salvation Army* (5th Cir. 1972) 460 F.2d 553. The Salvation Army is a church whose clergy are denominated "officers." *McClure* involved the termination of the plaintiff's commission as an "officer." She sued, claiming that she was the object of retaliation for making gender discrimination claims. (*McClure, supra,* 460 F.2d at p. 555.) The court held that the First Amendment necessarily exempted the church from the strictures of the federal civil rights laws in that context, noting that a minister is the "the chief instrument by which the church seeks to fulfill its purpose." (*McClure,* at pp. 559, 561.)

■ The basic contours of the ministerial exception as now developed in the common law are fairly stable. The test from *Schmoll* is whether the employee's duties " 'go to the heart of the church's function in the manner of a minister or a seminary teacher.' " (*Schmoll, supra,* 70 Cal.App.4th at p. 1439, fn. 4.) In order to be considered "clergy," an employee's primary duties must " ' "consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in a religious ritual and worship . . . ." ' " (*Id.* at p. 1439.) If this determination is made in the affirmative, "[t]he rule is about as absolute as a rule of law can be: The First Amendment guarantees to a religious institution the right to decide matters affecting its ministers' employment, free from the scrutiny and second-guessing of the civil courts." (*Id.* at p. 1436.)

Let's review the exact contours of the case law. First, there are the relatively easy cases where a court can be certain of the applicability of the ministerial exception as a matter of law based on the very nature of the plaintiff's job—it is, like the Salvation Army officer in *McClure*, unquestionably, inherently or exclusively religious, and the reason for the discharge implicates the religious teachings of the employer. (See e.g., *Gellington v. Christian Methodist Episcopal Church, Inc.* (11th Cir. 2000) 203 F.3d 1299 [minister]; *Combs v. Cen TX Ann Conf United Methodist Church* (5th Cir. 1999) 173 F.3d 343 [clergy member]; *Bell v. Presbyterian Church* (4th Cir. 1997) 126 F.3d 328 [ordained minister]; *Young v. N. Ill. Conf. of United Methodist Church* (7th Cir. 1994) 21 F.3d 184 [probationary minister]; *Rayburn v. General Conf. of the Seventh Day Adventists* (4th Cir. 1985) 772 F.2d 1164 [applicant for pastoral position at church]; *Kraft v. Rector, Churchwardens, and Vestry of Grace in New York* (S.D.N.Y. Mar. 17, 2004, No. 01-CV-7871) ___ F.Supp. ___ [2004 U.S. Dist. LEXIS 4234] [ordained priest]; *Williams v. Episcopal Diocese of Mass.* (Mass. 2002) 436 Mass. 574, 766 N.E.2d 820 [ordained priest]; *Dunn v. Board of Incorporators African Methodist Episcopal Church* (N.D.Tex., Dec. 18, 2001, Civ. A. No. 3:00-CV-2547-D) 2001 WL 1636399 [church reverend]; *Sanchez v. Catholic Foreign Soc. of America* (M.D.Fla. 1999) 82 F.Supp.2d 1338 [ordained priest seeking to be rehired as priest].)[7]

In essentially the same category are members of religious orders suing in regard to their relationship in the order. (See *Rosati v. Toledo, Ohio Catholic Diocese* (N.D. Ohio 2002) 233 F.Supp.2d 917 [novitiate released from order

---

[7] One court has indicated that there might be a "pretext" inquiry on the issue of whether an asserted religious reason for a discharge might be "pretext" for a nonreligious reason. (See *DeMarco v. Holy Cross High School* (2d Cir. 1993) 4 F.3d 166, 170–171.) Since we ultimately conclude that Hope did not establish the ministerial exception for purposes of its summary judgment motion anyway, we are spared the need to comment on the subject, though we will note that "pretext" analysis may be problematic indeed. It is fairly easy to imagine a hypothetical in which a preliminary inquiry into pretext would nullify the ministerial exception. Suppose a minister is fired by a senior minister, ostensibly for teaching some idea that did not accord which the orthodoxy of the particular religion. (E.g., Bishop to priest: "Your remarks on the doctrine of transubstantiation last Sunday sounded much more like something out of Martin Luther than Thomas Aquinas.") The discharged minister then asserts the reason is a pretext. (Priest to bishop: "Oh no they didn't—my remarks were perfectly orthodox, you just don't like my ethnicity, you're just trying to get rid of all us Irish guys in this parish.") How is a court to separate the pretext assertion from the unorthodoxy claim? (Bishop to priest: "No, I'm not! Your remarks were, in fact, heretical; it has nothing to do with the fact you're Irish." Priest to bishop: "Were not heretical!" Bishop to priest: "Were too!" Priest to bishop: "Well, we'll just see what the judge has to say about it.") A secular court is hardly in such a position to become the arbiter of heresy and orthodoxy, but it is hard to imagine a court meaningfully addressing a pretext claim in many instances without necessarily also getting entangled in an unorthodoxy claim.

because she got breast cancer]; *Turner v. Church of Jesus Christ* (Tex.Ct.App. 2000) 18 S.W.3d 877 [termination of Mormon missionary because of illness].)[8]

■ By the same token, individuals whose function is essentially liturgical, that is, connected to the religious or worship service of the organization, also come within the ministerial exception. Music and choir directors in particular come within the liturgical function aspect of the exception. (E.g., *E.E.O.C. v. Roman Catholic Diocese of Raleigh NC* (4th Cir. 2000) 213 F.3d 795 [director of music ministry and part-time music teacher at cathedral's elementary school]; *Starkman v. Evans* (5th Cir. 1999) 198 F.3d 173 [church choir director]; *Assemany v. Archdiocese of Detroit* (1988) 173 Mich.App. 752 [434 N.W.2d 233] [church organist]; *Egan v. Hamline United Methodist Church* (Minn. Ct.App. 2004) 679 N.W.2d 350 [church music director at church]; *Miller v. Bay View United Methodist Church* (E.D.Wis. 2001) 141 F.Supp.2d 1174 [ministerial exception applied to music and choir director of church].) Those who perform priestly functions that may not seem outwardly liturgical, but are inextricably intertwined with the particular religious doctrine of a religious organization may also be said to come within this category. (See *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.* (4th Cir. 2004) 363 F.3d 299 [kosher supervisor at Jewish home for elderly].)

■ Next are individuals whose duties for a church not only involve traditional public relations, but who are also, functionally, paid to actively proselytize on a church's behalf. (See *Alicea-Hernandez v. Catholic Bishop of Chicago* (7th Cir. 2003) 320 F.3d 698 [Hispanic Communications Manager for the Archdiocese of Chicago whose duties included outreach to local Hispanic community, including writing for church publications and translating church materials into Spanish].)

### b. *The Relatively Harder Cases*

Education, however, presents more conceptual difficulties; the line between "teaching" and "preaching" can be a fine one. There are preachers who use

---

[8] Some claims may not, at least on their face, implicate church-state entanglement even when they are between parties who clearly are in a clergy-religion relationship. In *McKelvey v. Pierce* (2002) 173 N.J. 26 [800 A.2d 840] the New Jersey Supreme Court allowed a priesthood candidate to sue a diocese for sexual harassment on the theory that the core of the dispute wasn't truly religious. That seems to make intuitive sense—after all, the ministerial exception should hardly protect a bishop who physically assaults a priest and then fires the priest for resisting, at least insofar as the priest might have a claim for battery, as distinct from wrongful termination. Beyond that, we need not comment further on the problem of what sort of claims come within or lie outside the ministerial exception, since we determine that the ministerial exception does not apply on this record, regardless of the nature of the claims.

chalkboards to point out to their congregations the nuances of classical Greek words and there are secular teachers of chemistry who approach their work with, as the saying goes, evangelical fervor.

On the ecclesiastical side of that line, the work of teaching religion for a *church*, as distinct from a *school*, obviously comes within the ministerial exception. (*Musante v. Notre Dame of Easton Church* (D.Conn., Mar. 30, 2004, No. Civ.A 3:01CV2352 (MRK) 2004 WL 721774 [director of religious education and pastoral assistant at Catholic church]; *Bryce v. Episcopal Church in Diocese of Colorado* (10th Cir. 2002) 289 F.3d 648 [youth minister].)

On the academic side of the line, we'll take the easy cases first. Where the *role* of the employee of an academic institution is inherently a religious one, like a campus chaplain, the ministerial exception applies. (E.g., *Schmoll, supra,* 70 Cal.App.4th at p. 1437 [plaintiff was "a minister of the gospel of Jesus Christ" whose job description included serving "the total campus community as a pastor," and performing "duties of leading worship"].)

Also, where the subject matter is the institution's own religion, the exception applies, regardless of whether the teacher is ordained or a member of a religious order (e.g., *E.E.O.C. v. Catholic University of America* (4th Cir. 1996) 317 U.S. App. D.C. 343 [83 F.3d 455] [nun who taught canon law]) or not (e.g., *Powell v. Stafford* (D.Colo. 1994) 859 F.Supp. 1343 [theology teacher at Catholic school]). Moreover, where the school itself is a seminary—that is, *exclusively* preoccupied with religion and the training of a religion's own clergy as distinct from more general learning—the ministerial exception has been categorically applied to faculty, ordained or not. (*E.E.O.C. v. Southwestern Bap. Theological Seminary* (5th Cir. 1981) 651 F.2d 277 [distinguishing faculty from nonfaculty].)

However, when neither the *role* of the employee nor the *subject matter* taught by that employee is necessarily religious, things become much less clear. Lay teachers of secular subjects at religious or parochial schools have been held *not* to come within the religious exception at both the high school level and especially elementary school levels. (E.g., *DeMarco v. Holy Cross High School, supra,* 4 F.3d 166 [math teacher at Catholic school, even though he led students in prayer and took them to mass]; *Guinan v. Roman Cath. Archdiocese of Indianapolis* (S.D.Ind. 1998) 42 F.Supp.2d 849 [ministerial exception did not apply to a fifth grade teacher at a religious school who taught both secular and religious subjects]; *E.E.O.C. v. First Baptist Church* (N.D.Ind. 1992) 1992 WL 247584 [ministerial exception did not apply to teachers at a religious elementary school]; *U.S. Dept. of Labor v. Shenandoah*

*Baptist Church* (W.D.Vir. 1989) 707 F.Supp. 1450, 1462, fn. 12 [employees of private religious school not considered clergy]; see also *Geary v. Visitation of the Blessed Virgin Mary* (3rd Cir. 1993) 7 F.3d 324 [ministerial exception not applied to lay teacher at church-operated school as long as teacher did not challenge the validity of religious reason for termination].)

And teachers of clearly *secular* subjects have also been held not to be within the exception, even though incidentally the teacher may have been a member of a religious order. (See *Welter v. Seton Hall University* (1992) 128 N.J. 279 [608 A.2d 206] [ministerial exception did not apply to nuns teaching computer science at religious school].) Just because your teacher is a Jesuit doesn't mean that he is automatically covered by the exception when he is teaching first year contracts or negotiable instruments.

. ▮ Along those lines, purely secular work performed for a religious institution has been held not to come within the ministerial exception. We might describe this as "the janitor rule"—as in: there's no question that the cleaning staff do not come within the ministerial exception (except maybe at a traditional monastery, where the cleaning staff *are* the members of the religious order and the cleaning is seen as very religious work indeed)— though of course it also extends to other sorts of work. (E.g., *Smith v. Raleigh Dist. of N. C. Methodist Church* (E.D.N.C. 1999) 63 F.Supp.2d 694 [ministerial exception did not apply to church receptionist or pastor's secretary]; *Lukaszewski v. Nazareth Hosp.* (E.D.Pa. 1991) 764 F.Supp. 57 [ministerial exception did not apply to director of plant operations at a religiously affiliated hospital].)

A variation of the janitor rule can be seen in *Catholic Charities of Sacramento, Inc., supra*, 32 Cal.4th 527, where a religiously affiliated entity providing immigrant resettlement, elder care, counseling, food, clothing and affording housing to the poor and needy and vocational training to the developmentally disabled did not even attempt to claim that any of its employees had the "religious duties of ministers," and in fact most of those employees weren't even members of the affiliated religion. (See *id.* at p. 544.)

c. *Application of the Exception In This Case*

▮ The point of our survey is to lay the foundation for this conclusion: We cannot say, on the record before us, *categorically* that professors Rouanzoin and Riggs are within the ministerial exception. They are nonordained and they teach a subject (marriage and family counseling) that is not *necessarily* religious. (See *E.E.O.C. v. Mississippi College* (5th Cir. 1980) 626 F.2d 477, 485 [suit brought against religious university by a psychology professor for sex discrimination did not violate First Amendment because

faculty and staff did not "function" as ministers or "attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine"].)

██ This is a summary judgment case. Disputes of fact are decided in favor of the *non*moving party. Hence we conclude, based on the procedure in which the case is before us now, that the defendants did not establish as a matter of law that the ministerial exception necessarily applied, and the trial court thus correctly denied the summary judgment and adjudication motion to the extent it relied on the ministerial exception. (Cf. *E.E.O.C. v. Southwestern Baptist Theological Seminary, supra,* 651 F.2d 277 [faculty members of seminary were categorically covered, nonfaculty not covered].)

Psychology is not necessarily a religious subject. The world is full of psychologists who vehemently disagree about the role of religion in psychology. For some (a view traditionally associated with Freud), religion is only relevant as a source of guilt and neuroses. In that regard, Rouanzoin's declaration in opposition to the motion for summary judgment stated that "while I integrated Christian concepts in my teaching, I was teaching, among other things, the science of clinical psychology." He further stated that there were students from "other secular schools"[9] who received training that "had no religious integration." The course syllabus, according to Rouanzoin's characterization of it, "demonstrates that the primary concepts related directly with clinical and scientific study of psychology."

Of course, the relationship between marriage and family counseling and the institution's religious mission is undeniable. Sex and marriage are major topics in religion. Whole churches have sprung out of marital controversies—history's most famous divorce was, after all, in re the marriage of Henry VIII and Catherine of Aragon. There, the issue of the "status" of marriage (as modern family lawyers would characterize it) ultimately turned on abstruse issues of theology regarding the permissibility of marrying one's dead brother's wife. So it is no surprise that it is undisputed that Rouanzoin and Riggs ran the school's Pacific Counseling Center, teaching students in the marriage and family therapy program to become *Christian* therapists. According to Mutunga, their job was to teach marriage and family therapy "through a Biblical approach."

---

[9] We will pass on the issue of whether Rouanzoin's insinuated assertion, without any supporting facts in his declaration to back up the statement, implying that Hope is a "secular" institution is a "fact" which must, on summary judgment, be assumed in his favor. The general rule, however, is that conclusions of fact are not binding on a summary judgment motion. (See *Hayman v. Block* (1986) 176 Cal.App.3d 629, 639 [222 Cal.Rptr. 293] ["affidavits must cite evidentiary facts, not legal conclusions or 'ultimate facts' "].)

So we cannot say categorically that they *could not* come within the exception, either. All we can say is that, in this proceeding on a summary judgment motion, Hope did not establish that they are *required* to come within the exception.

In an analogous situation at least one federal case has held that summary judgment based on the ministerial exception was not appropriate because the nature of the professor's teaching duties had not been adequately fleshed out. There, the teacher taught religious studies at a Catholic liberal arts college; here the professors taught psychology and marriage and family counseling at a Protestant religious university. The nature of the teaching duties was less secular but the institution was not as pervasively sectarian. (See *Hartwig v. Albertus Magnus College* (D.Conn. 2000) 93 F.Supp.2d 200, 212, fn. 14 [question of fact existed as to whether a recently self-declared homosexual professor of religious studies and philosophy at Catholic liberal arts college had primarily religious duties and thus fit within ministerial exception, and remanding case with regard to the nature of the professor's duties without prejudice so defendant could present "additional evidence concerning the nature" of plaintiff's "duties and responsibilities"].) We will follow suit.

Our conclusion obviates the need to address the degree to which our state's marital status antidiscrimination laws may be constitutionally underinclusive, a question which, given the present posture of the case, is now, strictly speaking, premature. Let us explain. Hope's argument goes roughly like this: Churches (i.e., "religious nonprofits") are explicitly exempt from our state's Fair Employment and Housing Act (FEHA). (Gov. Code, § 12926, subd. (d).) Presumably they could discriminate against their janitors as well as their choir directors. Religious hospitals, by contrast, are exempt from FEHA only *to the extent* employees perform *religious* duties. (Gov. Code, § 12926.2, subd. (c).) Presumably they can discriminate against chaplains but not janitors. Church colleges, however, are not exempt from FEHA *even* to the extent employees *do* perform religious duties, and even though the college *can* discriminate in initial hiring by restricting it to members of a particular religion. (Gov. Code, § 12926.2, subd. (f)(1).) Thus if one were to assume, for purposes of the case before us, that Rouanzoin and Riggs perform "religious duties," then religious hospitals get an exemption for employees performing religious duties that religious educational institutions don't get. According to Hope there is not even a rational basis for the distinction, i.e., a hospital chaplain can be fired despite the FEHA, but an instructor teaching fundamentalist ideas about marriage in a religious institution can't be. (Cf. *Little v. Wuerl* (3rd. Cir. 1991) 929 F.2d 944 [interpreting federal civil rights exemptions to extend to non-Catholic working at Catholic school to avoid constitutional entanglement problem].)

The issue is premature now because, in the present posture, it cannot be said that Rouanzoin and Riggs performed religious duties. In this proceeding in the wake of a summary judgment motion, they are analogous to the janitors employed by religious hospitals, not the chaplains.

However, *Little v. Wuerl, supra,* 929 F.2d 944, does establish a cautionary note in regard to the constitutional need to avoid religious entanglement, which the trial court can accomplish on remand by bifurcating the question of whether Rouanzoin and Riggs really do come within the ministerial exception, and having that issue tried first before the rest of the trial. (See Code Civ. Proc., § 597.)

In *Little,* a divorced Protestant was allowed to work at a Catholic elementary school. The teacher lost her job when she, as a divorced Protestant, married a Catholic without first having her prior marriage annulled. To the school authorities, that second marriage after divorce without proper annulment of her first marriage was tantamount to " 'publicly rejecting the doctrine and laws of the Church.' " (*Little v. Wuerl, supra,* 929 F.2d at p. 946.) She brought a federal civil rights action under title VII of the 1964 Civil Rights Act for religious discrimination when her contract was not renewed. The Third Circuit, noting that the very "process of review" itself would mean "excessive entanglement" with religion (*Little, supra,* 929 F.2d at p. 949), held that the civil rights law, which already clearly exempted Catholic schools when they discriminated in hiring and retaining Catholics over non-Catholics by using the phrase "of a particular religion," should also exempt non-Catholics otherwise hired by Catholic schools when they are fired by them. Thus the phrase "of a particular religion" within the civil rights law was broadly interpreted to mean "permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." (See *id.* at pp. 950–951.)

*Little* is, strictly speaking, not on point here because it had to do with the interpretative scope of title VII of the federal 1964 Civil Rights Act, not California's marital status antidiscrimination laws. However, its principle that courts should avoid putting themselves in a position where they must ascertain precisely what a religion's strictures do, or do not, entail is still valid.

By bifurcating Hope's ministerial exception defense (still viable, after all, even though not prevailing in this proceeding), the court will be able to determine, initially, whether the two professors really do come within the ministerial exception without being required to wade into the thicket of whether Hope had proper grounds under, say, its interpretation of I Thessalonians 5:22 ["abstain from the appearance of evil"] to fire them.

If they do, clearly the causes of action based on marital status discrimination must fail. We will leave to the trial court, and not comment at this juncture, whether the causes of action *independent* of marital status discrimination will also be swept aside in the wake of the determination that the ministerial exception applies. If they do not fall within the exception, then the court can continue with all causes of action (subject to another cautionary note we sound as to the merits of the marital status discrimination claims, explained below).

> C. *Was Hope Entitled to Summary Judgment On the Merits of the Marital Status Discrimination Claims? Not to the Extent the Claims Were Predicated On the Theory that Two People Could Not Work in the Same Department*

In *Chen v. County of Orange, supra,* 96 Cal.App.4th at page 939, we explained that there are certain claims that, "without doubt, implicate marital status discrimination." Among those types of claims listed were when a landlord refuses to rent to unmarried couples because they are not married, or an employer refuses to hire unwed mothers because they are not married or grants maternity leave to married teachers only because they are married. (*Id.* at p. 940.) In such cases the complaining party's case is based on discrimination *because of* a given marital status. For these, there is no analytical problem: The basis of the adverse action is the *status* of being married or unmarried, as the case may be.

On the other hand, sometimes marital status discrimination cases are based on adverse action taken against a person because of *something about* the plaintiff's spouse. (*Chen, supra,* 96 Cal.App.4th at p. 943.) These are not true marital status discrimination cases, but "conduit" cases—the marital status serves only as conduit for some other kind of animus. Of course, if *that* animus is actionable, the case may still survive, but only because of the wrongfulness of the real animus, e.g., race discrimination. Conduit cases not based on some other wrongful animus have, however, been "universally met with rejection." (*Chen, supra,* 96 Cal.App.4th at p. 943.) "In such cases, the marriage *qua* marriage is irrelevant . . . . What the employer really cares about is the substantive relationship between the plaintiff and someone else." (*Ibid.*)

In the present case we discern two distinct strains of alleged marital status discrimination. One is viable, the other is not.

The viable one may be traced to Elliston's deposition. He clearly admitted that one of the reasons Riggs's contract was not renewed was that the school

simply couldn't have two married professors making up an entire graduate department. In essence, he admitted the school was imposing an antinepotism rule.

In *Chen*, we noted in passing the divergence of jurisprudence on the question of antinepotism rules. (See *Chen, supra*, 96 Cal.App.4th at pp. 940–942.) The states appear closely divided on the subject, with courts in Hawaii, Minnesota, Montana, and Washington striking down antinepotism rules as violative of their state's marital status antidiscrimination laws and courts in Alaska, Illinois, Michigan, New York and West Virginia finding that antinepotism rules do not offend marital status antidiscrimination laws. (See *ibid.*)

 The divergence in the common law is moot in California because here the state civil rights statute impliedly provides that employers cannot have an a priori or automatic rule against married coworkers by stating that employers are allowed to "reasonably regulate . . . the working of spouses in the same department" (Gov. Code, § 12940, subd. (a)(3)), while regulations promulgated by the state Fair Employment and Housing Commission explicitly provide that if coworkers marry, the employer " 'shall make reasonable efforts to assign job duties so as to minimize problems of supervision, safety, security or morale.' " (*Chen, supra*, 96 Cal.App.4th at pp. 939–940, fn. 8, quoting Cal. Code Regs., tit. 2, § 7292.5, subd. (b), italics omitted.)

In the present case, there is nothing about two professors working in the same department which so overarchingly implicates "problems of supervision, safety, security or morale" that we could say summary judgment is appropriate. As we recently noted in *Steven F. v. Anaheim Union High School Dist.* (2003) 112 Cal.App.4th 904, 913 [6 Cal.Rptr.3d 105], high school teachers are "independent professionals who generally work alone"—how much more so do college professors fit in that category? True, a common pattern is that department heads typically evaluate professors within their departments—a "problem of supervision" in the language of the regulation—but we can hardly say that such a "problem" is so dispositive as to require summary judgment on the theory that the institution had no choice but to fire both professors. Deans, as distinct from department heads, have been known to perform evaluations too. In any event, if Hope can establish that it had no reasonable alternative in the wake of the Rouanzoin-Riggs marriage but to fire one or both of them, it can present that evidence at trial. For the moment, though, only conjecture would support summary judgment given the applicable regulatory framework.

However, we must also caution the trial court that there is no evidence of marital status discrimination outside of the *a priori* rule used by Elliston against married coworkers making up one department. That is to say, to the degree that Rouanzoin and Riggs claim they are the victims of marital status discrimination because they were discharged because of an unreasonable perception of having an affair prior to their marriage, Rouanzoin and Riggs are wrong. On that point there is no evidence that Hope cares at all whether its professors are married, single, or divorced, just as long as they are not perceived by its students to be committing adultery or fornication.

According to Hope, the school fired Riggs and Rouanzoin primarily because of a *perception* that the two had carried out an extramarital affair and had been dishonest about it. Now, that perception might not be objectively reasonable as secular courts must look at it, and it might not be supported by substantial evidence. But it is not a marital status discrimination claim, it is substantively a contract claim (specifically a contract claim not to be fired without objectively reasonable cause). There is nothing in the record (outside of the same-department issue) to suggest that Hope had, for example, anything against Rouanzoin or Riggs for being married, single or divorced *qua* married, single or divorced.

## IV. DISPOSITION

While the trial court should have entertained the possibility of summary adjudication as well as summary judgment, the request for a writ of mandate must still be denied. There are triable issues of fact as regard whether Rouanzoin and Riggs fall within the ministerial exception and triable issues of fact as to whether Hope discriminated against Rouanzoin and Riggs to the degree—but, we caution, only to the degree—that Hope chose not to renew Riggs's contract because it had a rule against two married people making up the full-time faculty in one department.

Each side will bear its own costs in this proceeding.

Rylaarsdam, J., and Ikola, J., concurred.